## JOHN CLARENCE V. STATE OF NEBRASKA.

FILED SEPTEMBER 25, 1911. No. 16,985.

1. **Criminal Law:** CHANGE OF VENUE. "A motion for a change of venue in a criminal prosecution is addressed to the sound discretion of the trial court, and, unless there has been an abuse thereof, its ruling on the motion cannot be disturbed." *Sweet v. State*, 75 Neb. 263.

2. ———: ADMISSION OF EVIDENCE: HARMLESS ERROR. The erroneous admission of evidence offered by the state in a criminal prosecution which can have no prejudicial effect upon the rights of the defendant will not, as a general rule, require the reversal of a judgment of conviction.

3. ———: HOMICIDE: TRIAL. The information charged the commission of the crime of murder in the first degree. Upon a trial of the accused he was convicted of murder in the second degree. The cause was removed to the supreme court by proceedings in error for review. The judgment of conviction was reversed and the case remanded for further proceedings. At the commencement of the second trial the defendant moved the court to require the county attorney to put him upon trial for manslaughter only, as he had been acquitted of murder in the first degree upon the former trial, and the supreme court had reversed the judgment of conviction of murder in the second degree. The motion was overruled. *Held,* No error, as the reversal of the judgment placed the accused in the same position he was prior to the former trial.

4. **Instructions,** given and refused, examined, and no error found.

5. **Homicide:** EVIDENCE: SENTENCE. The evidence submitted upon the trial is examined and found sufficient to sustain a verdict for manslaughter, but of a low grade, and the sentence is reduced from ten to two years in the penitentiary.

ERROR to the district court for Cass county: HARVEY D. TRAVIS, JUDGE. *Affirmed. Sentence reduced.*

*William Deles Dernier* and *John C. Watson,* for plaintiff in error.

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton, contra.*

REESE, C. J.

Plaintiff in error was prosecuted in the district court for Cass county for the murder of John P. Thacker. Upon the first trial he was found guilty of murder in the second degree. The cause was removed to this court by proceedings in error, when the judgment was reversed and the cause remanded for further proceedings. The case is reported in 86 Neb. 210. Upon a second trial the accused was found guilty of manslaughter and sentenced to ten years in the penitentiary. He again brings error to this court.

The facts disclosed upon the second trial are substantially the same as upon the first, and the statement thereof as contained in our former opinion will, to a considerable extent, relieve us from its repetition here. Such of the assignments of error, now presented, as seem to merit consideration will be taken up substantially in their order.

Before entering upon the trial, plaintiff in error (whom we will hereafter designate as the defendant) filed his motion for a change of venue from Cass county on the ground of the bias and prejudice of the people of said county. In support of this motion he filed between 30 and 40 affidavits from citizens of the county as well as his own and those of his attorneys, which tended to sustain

his claim of the existence of such bias and prejudice. The state filed between 70 and 80 counter-affidavits, which, to a considerable extent, contradicted those filed by defendant, and tended to show that little was said or thought about the case, and that there was no such bias and prejudice as would prevent him from having a fair and impartial trial. The motion for the change of venue was overruled, and the ruling is assigned for error here. The alleged crime was committed on the 15th day of January, 1909. The motion and affidavits were filed in October, 1910. The length of time intervening between the alleged killing and the second trial seems to have been sufficient to have decreased, if not entirely removed, whatever of feeling may have existed immediately after the homicide, and this fact, no doubt, was taken into consideration by the court in connection with the statements contained in the affidavits. Applications for change of venue are directed to the sound discretion of the court to which they are made, and the ruling of the court thereon will not be reversed, except in case of the abuse of that discretion. *Sweet v. State*, 75 Neb. 263. We can detect no reversible error in the ruling of the court upon that motion.

During the introduction of evidence in chief by the state, the prosecution was permitted to prove, over the objection of defendant, that for a long time before the killing of Thacker he (defendant) was in the habit of carrying a revolver, and that in some instances it was strapped or belted to his body under his coat and thus concealed. This evidence tended strongly to show that defendant had for many years, almost constantly, carried a revolver, but that fact was not concealed by him and was known by practically all with whom he was acquainted. We can see no good reason why the prosecution insisted upon making this proof, as it was a fact freely admitted by defendant, and his crippled condition and the business he was engaged in were assigned as a justification for carrying arms. The evidence could have but one logical effect, which was to show, beyond question,

that the possession of the pistol at the time of the homi-
cide was not the result of a special preparation for the
particular occasion with the purpose of taking the life
of decedent.   Stronger evidence of the lack of preparation
and premeditation could scarcely have been produced.
While the admission of this testimony was erroneous, yet
it could work no prejudice to defendant and was decidedly
in his favor, and he cannot be heard to complain upon
that account.   The contention that, technically, the pur-
pose of the evidence may have been to prove the commis-
sion of an offense under the provisions of section 25 of
the criminal code can have no bearing upon this case,
since it was abundantly shown by the state's witnesses
that he did not conceal his pistol, and therefore no offense
was committed, and the law, as it then stood, was not
violated.   Even had he concealed the weapon, his well-
known crippled condition would probably have furnished
his justification under the statute.

An unusual and seemingly unnecessary number of
photographs were introduced in evidence, some of which
were offered by defendant.   We have failed to find any
objection or exception to those offered by the state.   The
bill of exceptions is a large one, and there is no mention
in the briefs of the pages thereof where such exception
can be found, as required by the rules of this court.   We
have searched the record and find none.

At the commencement of the trial defendant moved the
court for an order requiring "the county attorney to put
defendant on trial for manslaughter only."   The reasons
assigned have reference to the former trial—that defend-
ant had been acquitted of murder in the first degree; that
the judgment of conviction of murder in the second degree
had been reversed by the supreme court; that no new or
other witnesses had been indorsed upon the information,
and the same state of facts as at the former trial would
be presented, and that the supreme court had reviewed
the evidence produced upon the former trial, etc.   This
motion was overruled, and the ruling is now assigned for

error. It is clear that the court did not err in overruling the motion. The information charged the crime of murder in the first degree. The reversal of the judgment of guilty of murder in the second degree and the remanding of the case for another trial placed defendant in the same position with reference to the information and the issues thereunder that he would have been had no former trial been had, and the whole case was open for investigation. *Bohanan v. State,* 18 Neb. 57. Had the evidence been sufficient to sustain a verdict finding defendant guilty of murder in either degree, and the verdict found him guilty thereof, there is no legal reason why sentence might not have been imposed accordingly.

A number of instructions to the jury were asked which the court refused to give, and it is contended that in this action the court erred. An examination of these instructions in comparison with those given by the court upon its own motion shows that the substance of all, which should have been given, was given, and some of them in practically the language requested. With two exceptions they related to the law of self-defense, which was sufficiently given in the court's instructions. The eighth instruction asked and refused was to the effect that the jury might find defendant guilty of assault and battery, if they believed the evidence so warranted. This was properly refused, as there was no evidence which could require the instruction to be given. The eleventh instruction asked and refused was to the effect that words spoken could not justify an assault. This was given by the court in the twenty-fourth instruction. We find no reversible error in the matter of instructions.

The most serious and perplexing question presented is in the contention that the verdict of guilty of manslaughter is not supported by sufficient evidence. Had it not been for the crippled and almost helpless condition of defendant at the time of the tragedy, we would have no hesitation in affirming the judgment to the full extent of the sentence imposed. But in the consideration of the

case this subject is one which is entitled to weight. Defendant took the witness-stand in his own behalf. On the part of the state Lee Thacker, son of decedent, was produced and examined. · The two did not vary in their version of the affair to any great extent, and, from the reading of their testimony, we are impressed with their apparent candor and truthfulness. In some particulars they differed, but to no greater extent than would naturally be expected when we consider the length of time they were on the stand and the care and searching character of the examination and cross-examination of each. On the morning of the tragedy, a brother of decedent accosted defendant and informed him that decedent had expressed himself as desiring an opportunity to assault and "beat up" defendant. So far as the evidence shows, this was the first intimation defendant had that decedent entertained any animosity toward him, if any such existed. Their personal relations had been friendly, so far as appeared. It is true that a witness testified that on a previous occasion defendant made use of language which would indicate that, had he received treatment from decedent similar to that imposed upon another, he would have effectually resented it, but this was denied by defendant. However, were the statement made at the time testified to, it was so long prior to the time of the killing as to have but little weight in considering defendant's purpose on that occasion. On the next day after the tragedy, and at the time when decedent had little, if any, hope of recovery, he made a statement of his version of the affair, which was to the effect that, when he advised Carter Albin to slap the young man with whom he was quarreling, defendant said to decedent, "Keep your damn nose out of that business or I'll shoot hell out of you;" that he, decedent, then started around the head of the horses (evidently going toward defendant), and, when some 12 to 14 feet from defendant, defendant shot him in the leg; that decedent then picked up a stick and struck defendant over the head, then seized the cane which de-

fendant had and struck him with it, when defendant shot decedent two other times; that decedent thought he had struck defendant "hard enough to knock an ox down, but he had to knock him down with his fist;" that he thought it was no use to try to run away, for defendant would "shoot him to pieces," so he thought he would try to get the gun away from him; that another person, named, had shot at him once before, and he thought the gun defendant had was the little one the other person had and he knew he could "eat" that one, but knew it was not when defendant commenced to shoot. This statement is written in the third person, and was not skillfully drawn. It was not signed by decedent, but by the bystanders, or those who had heard him state his version of the difficulty. There is a conflict in the evidence as to the exact language used by defendant at the time decedent advised the assault upon one of the persons in the quarrel. It appears that no word was spoken by either decedent or defendant after defendant ordered decedent not to interfere in the quarrel between the other two, nothing having been said by decedent to defendant during the whole time. There was sufficient evidence, whether true or not, to sustain the finding of the jury that defendant ordered decedent to keep his mouth out of the quarrel between the other two, or he would shoot him; that thereupon decedent started toward defendant, and, when 12 to 14 feet from him, he stooped down to pick up a stick or board; that at that moment of time defendant shot at decedent, striking him in the leg, the ball passing through the flesh above the knee, but not fracturing the bone; that decedent then closed in on defendant and struck him on the head with the stick or board, when defendant raised his cane, either for offensive or defensive purpose, which decedent took from him and struck him one or more violent blows upon the head; that the cane was then dropped. In the statement made by decedent, he is represented as saying that he knocked defendant down with his fist. This is not sustained by any other testimony,

but defendant testified that after receiving the blows he could not say in detail what did occur. It is clear that about that time, in fact at the moment, decedent caught defendant around his body, standing to his left side and somewhat in the rear, when another shot was fired taking effect in the lower part of the body of decedent, when both fell to the ground, decedent upon defendant, and that while falling or immediately after striking the ground the fatal shot was fired, the ball passing downward through the stomach of decedent. The parties were separated, when decedent was taken to his home in a carriage, and defendant procured his horse, rode to Plattsmouth, inquired for and found an officer and surrendered to his custody. There was no quarrel between defendant and decedent, the only remark having been made by defendant when ordering decedent to keep out of the controversy between the other two. The jury probably found that in that order there was a threat to shoot decedent in case he interfered further. If the jury found that at the time of the firing of the first shot there was no sufficient reason or ground for defendant to fear an assault by decedent, of such a character as to endanger his life or inflict great bodily harm, their conclusion might be that he invited and induced the attack, and for that reason he could not plead self-defense to the extent of justifying his acquittal, and therefore he was guilty of manslaughter. This view of the case would justify the verdict, but, probably, by quite a narrow margin. From a careful consideration of the evidence, we do not see our way clear to hold, as matter of law, that the verdict is unsupported by the evidence. However, we all agree that the sentence imposed by the court was excessive under the peculiar circumstances as shown by all the evidence. When we consider the size, strength and disposition of decedent, his apparent willingness to engage in the contest, his severe and violent assault upon defendant after the firing of the first shot, and the almost helplessness of defendant in his hands, we are constrained to say that, while we are un-

52

able to set aside the verdict, we do not hesitate to very materially reduce the sentence.

The sentence will therefore be modified to the extent of reducing it to two years' confinement in the penitentiary at hard labor, but without solitary confinement, and the payment of the costs of prosecution, and, as thus modified, the judgment is

AFFIRMED.