WALTER RAY SIMMONS V. STATE OF NEBRASKA.

FILED FEBRUARY 13, 1924. No. 23237.

1. **Criminal Law:** CHANGE OF VENUE. A motion for a change of venue in a criminal case is addressed to the sound discretion of the trial court, and its ruling thereon will not be disturbed unless an abuse of such discretion is disclosed.

2. **Homicide:** SUFFICIENCY OF EVIDENCE. Evidence examined and outlined in the opinion *held* sufficient to sustain a conviction of first degree murder.

3. **Criminal Law:** ADMISSIBILITY OF EVIDENCE. In a prosecution for murder, it is proper to admit in evidence bloody garments and other blood-stained articles, when a sufficient foundation has been laid, if they tend to illustrate or make clear any controverted issue in the case.

4. ———: ADMISSION OF EVIDENCE: HARMLESS ERROR. In a criminal case, the admission in evidence of articles of clothing and other personal effects of the defendant that are not relevant or material to any controverted issue in the case, but which are not prejudicial to the defendant, is harmless error.

5. ———: NEW TRIAL. Whether a motion for a new trial in a criminal case, based on alleged misconduct of jurors, should be sustained rests in the sound discretion of the trial court, and its ruling on such motion will not be disturbed unless an abuse of discretion is shown.

6. ———: MOTIVE. In a criminal prosecution, motive may be of assistance in shedding light on the intent with which the act was done or in removing doubt and completing proof which might otherwise be unsatisfactory, but it is not an essential element of the crime.

7. **Homicide:** REFUSAL OF INSTRUCTION. In a prosecution for murder in the first degree, it is not error to refuse to instruct the jury as to the law applicable to manslaughter, when the evidence conclusively establishes that the defendant is either guilty of the crime charged or entirely innocent.

8. **Criminal Law:** "WITNESS ON STAND." One whose deposition is being taken is, while testifying, "a witness on the stand."

9. ———: INSTRUCTIONS. Whether an instruction to the jury is a correct statement of law applicable to the issues must be determined from an examination of the whole charge to the jury, and not from an isolated sentence in a single instruction.

10. ———: NEW TRIAL. The district court does not possess jurisdiction to grant a new trial in a criminal case for newly discovered evidence, when the motion is filed more than three days after verdict and at a subsequent term of court.

11. **Homicide:** SENTENCE: REVIEW. Where a defendant, after a fair trial, has been convicted of murder in the first degree and the jury, by its verdict, has imposed the death penalty, and the court has passed sentence in conformity with the verdict, this court will not interfere with such sentence on the ground that it is excessive, in the absence of any mitigating circumstances.

ERROR to the district court for Boyd county: ROBERT R. DICKSON, JUDGE. *Affirmed.*

*Holmes, Chambers & Mann, W. T. Wills, Josiah Coombs* and *A. H. Tingle,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Lloya Dort, contra.*

Heard before MORRISSEY, C. J., LETTON, ROSE, DEAN, DAY and GOOD, JJ.

GOOD, J.

Plaintiff in error (hereinafter called defendant) was convicted of murder in the first degree and sentenced to death by electrocution. He prosecutes error to have this court review the record of his trial and conviction. In the information the state charged that on May 14, 1922, the defendant, with a hammer, assaulted and killed one Frank Pahl.

A multitude of errors are assigned, but we shall consider only those urged upon the court in the briefs. At the outset, defendant insists that the court erred in denying his motion for a change of venue. In support of his motion, defendant filed his own affidavit and that of his counsel and of five other persons. These affidavits tended to show that, because of the sensational articles appearing in the newspapers of the locality, the minds of the citizens had become inflamed and prejudiced against the defendant to such an extent that it was impossible to secure a fair and impartial jury. It may be observed that, aside from the affidavits of the defendant and his counsel, those whose affidavits were filed fail to disclose what their business, occupation or standing in the community were, so that this court is not in a position to determine the weight which should be given to their testimony. It is disclosed, however, by the counteraffidavits that at least one of them had been for a considerable time an inmate of the county jail, and another was the father of this inmate. The state filed twice as many counter-affidavits of persons who were merchants, postmasters, county officials, and evidently men of high standing in the community strongly contradicting the charge that there

Simmons v. State.

was any general feeling of bias or prejudice against the defendant. In addition to that, when the trial was had some months later, it does not appear from the *voir dire* examination of the jurors that there was any great amount of prejudice existing against the defendant in the community. The ruling complained. of is supported by strong and convincing evidence and appears to be in accord with the overwhelming weight of the evidence. At most, it was a question for the sound discretion of the trial court, and no error can be predicated thereon, unless there has been an abuse of such discretion. No such abuse is apparent. Comp. St. 1922, sec. 10048; *Clarence v. State,* 89 Neb. 762; *Sweet v. State,* 75 Neb. 263; *Lindsay v. State,* 46 Neb. 177.

Defendant strongly urges upon this court that the evidence is insufficient to establish the guilt of the defendant beyond a reasonable doubt. A number of the assignments of error deal with this proposition. No eyewitness testified to the assault which caused Pahl's death. The evidence is wholly circumstantial. We have read and carefully considered all the evidence in the voluminous record. Space forbids an attempt to outline all of the testimony, but we shall point out some of the circumstances disclosed by the record.

Defendant had been a resident of Montana most of his life and only a few months before the tragedy came to Nebraska. He was a married man with a wife and children. It does not appear that his wife and children came with him to Nebraska, or that he had been living with them for some months. He was a stranger in Boyd county, and had come into that county from South Dakota on the day that the crime was committed. It is shown that on the 11th day of May, 1922, the defendant stated to a witness that he had but $1.50 in money. A few days before the crime he had obtained $5 on a "no fund" check. He "beat his way" on a train from Burke, South Dakota, to Spencer, Nebraska, on Sunday morning, May 14. During that day he was around and about Spencer and attended a ball game. In the evening of the same day he attempted to employ one Adkins

to take his automobile and drive defendant into the country, to obtain a quantity of intoxicating liquor. At about 10 o'clock on Sunday night he approached Mr. Caywood, a restaurateur, in his place of business and made inquiries if he knew of some person whom he could get to drive him into the country, and intimating that he desired to go for some contraband liquor. Caywood responded that he thought he could get some one to drive for him. Thereupon, Pahl was called to the restaurant over the telephone. Pahl informed the defendant that he had a Ford truck and also an Oldsmobile car. Defendant insisted upon the Oldsmobile, and an agreement was made there that Pahl should drive him in the country for a distance of about 18 miles in a southerly direction on the O'Neill road, and that defendant should pay him $20 for the drive. Defendant asked Pahl to obtain a hammer or hatchet, as they might have need of it. When Pahl went for his car, defendant picked up a hammer in the restaurant and observed that Pahl might forget to bring a hammer or hatchet, and that he would take the hammer and return it the next morning. Pahl and the defendant left Spencer at about 10:30 p. m., the defendant being in the rear seat of the car. There was also in the rear of the car a canvas or muslin automobile cover. No witness, save the defendant, ever saw Pahl alive after this time. Two days later Pahl's body was found beneath a bridge about nine miles northeast of Spencer. The body was dressed in the same manner as when he left Spencer, including the gloves on his hands which he wore when he left Spencer. The cap of the deceased was missing. An examination of the body disclosed that he had been struck with a blunt instrument on the right side of the head, just back of the ear, with sufficient force to crush in his skull and cause his death. The wound was about one inch in diameter and such as might have been made with a hammer. But 10 cents was found on the body. It was shown that when Pahl left Spencer he had $480 in currency in his possession. The wife of the deceased had counted the money, rolled it up and tied a string about it, and in counting and rolling the bills

Simmons v. State.

there were a number which she was able later to identify.

On the morning of May 15, about seven or eight hours after Pahl and the defendant had left Spencer, the latter was found at the home of Orien Porter, about 16 miles northwest from Spencer and near the Missouri river. Defendant was alone and had come there in the latter part of the night or early morning in Pahl's car. When Mr. Porter discovered him there at 5:20 in the morning, defendant stated that he had lost his way and was trying to reach Fort Randall. Porter gave him directions as to how to reach Fort Randall, which was to the east of Porter's home. Porter observed that there was blood upon the car and called defendant's attention to it. Defendant stated that the car belonged to a butcher, and that on the day previous a part of a carcass had been hauled in the car, and he thus attempted to account for the blood in the car. Defendant left Porter's in haste, taking the road as directed by Porter, but instead of going to Fort Randall he went first south and then east to a point a mile and a half from Fairfax, South Dakota. At this point he drove to the home of Mr. Opbroek, 85 rods north of the highway, and drove into Mr. Opbroek's yard, leaving his car on the north side of the barn where it could not be observed from the highway. He falsely stated to members of the Opbroek family that he had burned out a connecting rod and desired to leave the car there until he could procure repairs, which might be a day or two, and immediately left, going directly to Fairfax on foot. At Fairfax he entered a clothing store and purchased a brown suit of clothes, shoes, cap, and raincoat, and left in the store a part of the clothing that he had worn, stating to the clerk from whom he purchased the new clothing that he was going to Sioux Falls. Instead, however, he boarded a train and went direct to Norfolk, Nebraska. There he registered at a hotel under an assumed name and again went to a clothing store and purchased a blue suit of clothes, another pair of shoes, and a cap, and changed his apparel. Members of the Opbroek family, shortly after the defendant left their home, discovered blood upon the car, and an examination

Simmons v. State.

showed Pahl's name or initials on the car; that blood was on the windshield and some on the back of the front seat, and blood sprinkled or spurted on the interior of the top of the car at a point just over the position of the driver's head, and a considerable quantity of blood was on the floor of the rear part of the car. This fact was communicated to the officers at Fairfax, and in the meantime it was discovered that the clothing which defendant had left at the clothing store was blood-stained. Suspicion was aroused, tracers were sent out, and the defendant was arrested in Norfolk in the afternoon of the same day. He told the officers that he had come there from Sioux Falls, but this was shown to be false. He was taken to Burke, South Dakota. At this time Pahl's body had not been found, but his car was found and search was instituted, which resulted in the finding of Pahl's body in the evening of May 16. The automobile cover and a hammer, later identified as the hammer which was taken by defendant from Caywood's restaurant, were found at about this time in the field adjacent to the highway, over which defendant had driven, between the homes of Porter and Opbroek. The automobile cover was blood-soaked and the hammer was blood-stained. At about the same time the hat which defendant wore on the night he left Spencer with Pahl was found along the road between the Opbroek home and Porter's. The hat was blood-stained and upon the crown there was blood in small spots, as if blood had been sprinkled or spurted on the hat.

When defendant was arrested he had on his person $355 in currency and $5.15 in silver. Three of the bills were later identified by Mrs. Pahl as being three bills which were contained in the roll of currency that her husband had at the time he left Spencer with defendant. Also, the cap which was left by defendant at Fairfax, when he purchased a new outfit of clothing, was identified as being the cap which Pahl wore on the night of the tragedy.

The defendant was a witness in his own behalf, and he testified that on the 14th day of May, at Spencer, he met one Currier, whom he had previously known in Montana as a

professional bootlegger; that Currier told him he had a car-
load of liquor out in the country and that his car had bro-
ken down, and that he wanted some one with a good car to
go out that night and get the liquor, stating that this liquor
was about 18 miles from Spencer; that it was for the pur-
pose of getting this liquor that he engaged Pahl to drive into
the country; that about seven miles out from Spencer he and
Pahl met another car, containing two persons, one of whom
was  Currier; that they stopped and had a few minutes' con-
versation; that thereupon it was arranged that Pahl should
take his car and go with the other two men, while defend-
ant should remain near the cross-roads to watch for the
possible approach of officers; that they were gone from
an hour and a half to three hours, when Currier returned
alone in Pahl's car; that Currier stated that they had dis-
posed of the liquor which they had in the car, that Pahl
was going to Fort Randall for another load of liquor, and
that defendant should take Pahl's car and meet Pahl at
Fort Randall; that he got into the car and drove with
Currier to a point northeast from Spencer and not far from
Fort Randall, when Currier got out of the car and paid
defendant $352 as his share of the profits in the liquor
transaction; that at this time he discovered a cap on the
seat and put the cap on and threw his own hat in the rear
of the car; that his hat had not been off of his head from
the time he left Spencer with Pahl until he exchanged his
hat for the cap; that he lost his way and did not find Fort
Randall, but stopped at the home of Porter and slept on
Porter's porch until daylight, when Porter discovered him
there; that up to this time he did not know that anything
had happened to Pahl and did not know that there was any
blood on or in the car.   He attempted to account for the
blood upon his hat by saying that it must have gotten there
when he threw it in the rear of the car.   It is apparent that
this is untrue, for the blood had been in the car for at least
some hours and would be clotted.  If the blood on the hat
had come from this source it would appear as a smear or
splotch, and not in small spots, as if sprinkled or spurted

from an artery. Physicians testified that where the wound was inflicted upon Pahl's head an artery was severed, and that blood would spurt from such a wound for a distance of two or three feet. It was the theory of the state that defendant killed Pahl by striking him with a hammer while he was seated in his car; that the blood in the interior of the car over the driver's seat came from the spurting blood from the wound; that the crime was committed for the purpose of robbery.

The evidence discloses that the amount of money spent by defendant for clothing at Fairfax and at Norfolk, together with his railroad fare and some other articles which he purchased, and the money which was found upon his person just about equaled the $480 that Pahl was known to have carried with him on the night of May 14. While defendant claimed that he had $145 or $150 when he reached Spencer on the 14th of May, he admitted upon cross-examination that he had about $200 from his previous year's work when he came to Nebraska; that out of this he had bought a horse, saddle and bridle for $75; that he later sold the same for $50, and that since the fall previous he had earned $21 or $22, but he had lived for several months and kept the horse for part of the time; so it is apparent that he must have lived most economically, if his statements were true; and, while he claimed that Currier had paid him $352 for his share of the profits of the liquor transaction, he admitted on cross-examination that he had purchased no liquor, had sold none and had seen none. It is further significant that when he was first arrested and charged with the offense, after the discovery of Pahl's body, defendant told somewhat the same story, except that he said he did not know the names of the bootleggers and had never seen them before. He made many other contradictory statements and damaging admissions. The story he told as to how he obtained the $352 is so unreasonable and improbable as not to be credible. The jury evidently disbelieved his story. We think they were justified. From a consideration of all of the testimony, we think it is sufficient to

establish his guilt beyond a reasonable doubt, and justifies the verdict rendered.

A considerable number of the assignments of error are based on the theory that the court should not have admitted in evidence certain exhibits, consisting of the hammer, the automobile cover, the currency found on the person of the defendant, and various articles of clothing worn by the defendant at or shortly after the homicide. Defendant contends that these articles tended to inflame the minds of the jury and did not tend to establish the crime or defendant's connection therewith. It must be borne in mind that at the time these articles were introduced in evidence defendant had not testified, and his theory of the transaction was unknown. Most of the articles admitted in evidence had a direct bearing and tended to prove the manner in which Pahl met his death, and tended to connect the defendant with the crime. In *Blazka v. State,* 105 Neb. 13, it is held: "In a prosecution for murder, bloody garments and photographs of wounds upon the body of the victim are proper to be received in evidence, when sufficient foundation has been laid, where they tend to illustrate or make clear any controverted issue in the case." We think that most of the articles, the admission in evidence of which is complained of, either tended to illustrate the manner in which the crime was committed or to establish the defendant's connection therewith, and were therefore properly admitted in evidence.

Some of the exhibits, consisting of articles which defendant had in his possession—a traveling bag which he had purchased and some other articles—do not appear to have been material or relevant to any issue in the case, but it is not apparent that the introduction of these articles in evidence could have had any influence on the minds of the jury in determining the guilt or innocence of the defendant. Conceding that it was error to admit them, still it was error without prejudice, and errors which do not tend to produce any prejudice in the minds of the jury do not constitute a ground for reversal.

Complaint is made as to alleged misconduct of one of the jurors. Before any evidence was taken in the case, the court made an order directing that the jury should be kept together in the custody of an officer during the trial. One night, during the progress of the trial, a juror was taking some medicine and informed the officer in charge that he might have to absent himself from the jury room to respond to the call of nature. He did so, and on returning found the doors locked. In this predicament he went to the hotel where the presiding judge was stopping and informed the innkeeper, who thereupon advised the judge. Directions were given for getting the juror back into the jury room. It appears that the juror was absent from the jury room from three-quarters of an hour to an hour and a half, that during that time he saw and spoke to no person except the innkeeper and nothing was said relating to the case on trial. Nothing occurred that could have worked any prejudice to the defendant. We think no misconduct of the juror was shown. In any event, it was not sufficient to warrant granting a new trial. *Spaulding v. State*, 61 Neb. 289; *Carleton v State*, 43 Neb. 373; 16 R. C. L. 307, sec. 117.

Defendant asserts error in the overruling of his motion for a new trial, on the ground of misconduct of three jurors, namely, Smith, Fedde, and Berg, and contends that the evidence shows that these jurors had all formed and expressed opinions as to the guilt of defendant before being called as jurors, which fact was unknown to defendant and his counsel until after the verdict, and that the jurors falsely stated on their *voir dire* examination that they had no opinion as to the defendant's guilt. The record does not disclose that Berg acted as a juror, and the only evidence as to the juror Fedde is a purported affidavit by George Moody, to the effect that before the trial Fedde stated: "That the reason the jury executed Simmons was that they wanted to save the county money and further costs." This purported affidavit is signed by the affiant, but is not attested by the signature of a notary. It was not, therefore, an affidavit and was not competent evidence. It may be observed that

it presents an impossible statement of fact. Prior to the
trial the juror could not have known what the verdict would
be, much less state the reason for the verdict. As to the
juror Smith, there are two affidavits in identical language,
by two persons bearing the same surname, to the effect that
prior to the trial the juror said: "They ought to have let
the mob have him and saved the county the expense, or
words to that general effect." The record affords no infor-
mation as to the business, profession, character or standing
of these affiants. They simply stated that they were resi-
dents of Boyd county at the time the affidavits were made.
The place where and the circumstances under which the al-
leged statements were made by the juror are not disclosed.
Juror Smith was called, sworn, and testified in rebuttal, and
denied that he had ever made such statements at any time
or place or to any person. The trial court was in a position
to observe the demeanor and manner of the juror while tes-
tifying, and doubtless knew the character and standing of
the juror as well as of the affiants, and was in a
better position to determine the weight that should
be given to the evidence of the respective parties. The ques-
tion was one calling for the exercise of a sound judicial dis-
cretion. The ruling thereon should not be interfered with
unless there was an abuse of such discretion, and none such
appears. See *Carleton v. State, supra; Spaulding v. State,
supra;* 16 R. C. L. 307, sec. 117.

Defendant urges that a motive for the crime must be
proved, and contends that the state has failed to prove de-
liberation and premeditation. "In a criminal prosecution
the state is not required to prove a motive for the crime, if,
without this, the evidence is sufficient to show that the act
was done by the accused. The existence or nonexistence of
motive is immaterial where the guilt of the accused is clear-
ly established. The most laudable motive is no defense
where the act committed is a crime in contemplation of law,
and on the other hand a bad motive does not make an act a
crime if it is not so in law. * * * While, however, motive is
never an essential element in a crime, it may be of assistance

in throwing light on the intent with which the act was committed, and in removing doubt and completing proof which might otherwise be unsatisfactory, especially in cases depending on circumstantial evidence." 16 C. J. 78, sec. 43.

We think the circumstances detailed in the opinion, together with other evidence in the record, clearly show that defendant contemplated committing the crime before he left Spencer with Pahl. The procuring of the hammer in advance and the luring of Pahl to take his car and go out after a cargo of liquor, when there is every reason to believe from the evidence that no such cargo of liquor existed, indicate clearly deliberation and premeditation.

The defendant complains of the giving of the seventh and eighth instructions. The seventh instruction informs the jury of the material elements necessary to constitute the crime of murder in the first degree, and the eighth instructs as to the material elements necessary to constitute murder in the second degree. The seventh instruction then contains the following: "If the state has established these facts by the evidence, beyond a reasonable doubt, then it will be your duty to find the defendant guilty of the crime of murder in the first degree." And the eighth instruction contains a like clause relating to murder in the second degree. The criticism is that it withdraws from the jury consideration of the evidence on behalf of the defendant, and requires the jury to predicate their verdict upon the evidence introduced by the state. We do not think that the instructions are fairly subject to the criticism made. Nowhere do they inform the jury that they shall consider only the evidence on behalf of the state; and in other instructions the jury are directed to consider all of the evidence introduced. The contention is without merit.

Complaint is made because the court refused to instruct the jury on the charge of manslaughter. In *Strong v. State*, 63 Neb. 440, it is held: "The court, in charging the jury, is only required to state the law applicable to the facts proved and those which the evidence tends to prove. So, where it is conclusively shown that the defendant either committed

the crime charged or is entirely innocent, the failure to instruct with respect to other crimes, or inferior degrees of the crime, embraced within the facts alleged in the information, is not error." To like effect are *Jahnke v. State,* 68 Neb. 154, *Clark v. State,* 79 Neb. 482, and *Thompson v. State,* 85 Neb. 244. There is no evidence in the record of any quarrel between the defendant and Pahl, nor any facts which would justify the submission to the jury of the charge of manslaughter. The trial court properly refused to give the proffered instruction.

Complaint is also made of instruction No. 20. The court in this instruction directed the jury not to consider any of its rulings as an indication of the opinion of the court as to defendant's guilt or innocence; that they should determine the issues from a consideration of all the evidence; that statements of counsel made in the course of the trial and statements of the court in rulings were not evidence, and told the jury the purpose of opening statements, of arguments by counsel, and of instructions of the court, and then told the jury that evidence is what the witnesses have been permitted to say while on the witness-stand and such exhibits as have been received in evidence. The criticism is made that in stating what is evidence the court omitted to mention depositions and the presumption of innocence which attends the defendant in a criminal action. Failure to mention depositions is of no importance, because one whose testimony is being given in the form of a deposition is, while testifying, a witness on the stand, and the clause in the instruction, "what the witnesses have been permitted to say while on the witness-stand," refers as plainly and clearly to the evidence taken by way of deposition as it does to the evidence taken in open court. It is true that the presumption of innocence is frequently referred to in the decisions as a matter of evidence, and the court in instruction No. 12 fully covers this question and properly informs the jury as to the law on the subject. It is apparent that the purpose of instruction No. 20 was to caution the jury that they should not consider as evidence statements made by counsel or the

court during the progress of the trial. It was not intended to withdraw from their consideration the presumption of innocence which the law gives to the defendant in a criminal action. The instructions should be considered together and as a whole, and, when so taken and considered, they fully and correctly state the law applicable to the issues in the case.

Defendant complains that the district court overruled its supplemental motion for a new trial, based upon the ground of newly discovered evidence. This motion was filed after the adjournment of the term at which defendant was tried. The rule is well settled in this state that the district court possesses no jurisdiction to grant a new trial in a criminal case, on the ground of newly discovered evidence, at a subsequent term to that at which the verdict of guilty was returned. *Hubbard v. State,* 72 Neb. 62; *Evers v. State,* 87 Neb. 721; *Fouse v. State,* 83 Neb. 258; *Dodge v. People,* 4 Neb. 220; *McCoy v. State,* 110 Neb. 360.

Finally, defendant urges that the sentence is excessive and that the record does not warrant the imposition of the death penalty. Personally, the writer is not in sympathy with the law that takes the life of any one as a punishment for the commission of a crime. However, the duty of the court is to administer the law as it exists, and not as it would prefer it should be. The evidence indicates that defendant killed Pahl by a blow of a hammer, and that the act was wilful, deliberate, premeditated and committed for the purpose of robbery. The record shows no quarrel, grudge, or ill-feeling. There are no mitigating circumstances. The law empowers the jury, in cases of this kind, to determine whether the punishment shall be life imprisonment or death. The jury, after hearing all the evidence, determined that the death penalty should be inflicted. No reason is apparent for disturbing the jury's action.

No prejudicial error has been found in the record, and the judgment is affirmed, and Friday, the 23d day of May, 1924, between the hours of 6 o'clock a. m. and 6 o'clock p. m.

of said day, is fixed as the date for carrying into effect the sentence of the district court.

AFFIRMED.