CLYDE D. MACOMBER V. STATE OF NEBRASKA.

291 N. W. 674

FILED APRIL 12, 1940. NO. 30473.

*Hoagland, Carr & Hoagland, Beeler, Crosby & Baskins* and *Robert B. Crosby,* for plaintiff in error.

*Walter R. Johnson*, Attorney General, and *Milton C. Murphy*, contra.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

MESSMORE, J.

The defendant, Clyde D. Macomber, was charged in the district court for Lincoln county, with Albert A. Hastings and Joseph R. Baskins, with robbing Sam I. Pappas of $275 (this count was dismissed) ; with unlawful assault, with intent to inflict great bodily harm, on Sam I. Pappas, resulting in the conviction of defendant Macomber of assault and battery, for which he was sentenced to 60 days in jail; and in count one of the information with the crime of kidnaping. The language constituting this charge is substantially as follows:

Albert A. Hastings, Clyde D. Macomber and Joseph R. Baskins (late of Lincoln county), on or about November 21, 1937, did unlawfully and feloniously carry off, decoy, entice away, secrete and imprison Sam I. Pappas for the purpose of compelling Sam I. Pappas, forcibly and against his will, to confess and admit that he had committed the crime of sodomy. The maximum penalty for sodomy, under section 28-920, Comp. St. 1929, is 20 years in the penitentiary. Macomber was convicted of kidnaping, and, upon the overruling of the motion for a new trial, sentenced to serve the remainder of his natural life in the penitentiary. As plaintiff in error, he presents to this court for review the record of his conviction. The record contains 107 assignments of error and nearly 2,000 pages of other matter.

Plaintiff in error contends that the verdict of the jury finding defendant Macomber guilty of kidnaping is contrary to the evidence and the law. The record discloses:

On the evening of November 13, 1937, Glenn Hardenbrook, a boy 17 years of age, was caught in the act of committing the crime of sodomy with another young boy at the Union Pacific depot in North Platte. An arrest was made by police officers Westphal, Lindekugel and Macomber. The

Hardenbrook boy was taken to the city police station and subsequently questioned with reference to becoming a moral pervert. It developed that he had first been taught by a man in Denver and later had such relations with one Sam Pappas, employed in a restaurant and known as "Coney Island" Sam Pappas. Hardenbrook remained in the city jail, and on Saturday evening, November 20, 1937, he talked to Albert A. Hastings, a defendant, who conducted an insurance and loan business in North Platte and who was active in city politics. His presence at the police station was accounted for in that he had been called by Officer Lindekugel on November 17, 1937, and learned about the case from such officer and from Amiel Traub, desk sergeant. The record discloses an offer to prove, as part of the defense, that one of the police officers had talked to the county attorney, and it was suggested by the latter that Hastings had become interested in procuring evidence in the case. It is shown in the record that a conversation was had between Hastings and the county attorney in the latter's office "about ways and means of clearing up this case, about the parties that had been getting this boy started, and I (the county attorney) mentioned the fact if Al Hastings heard about this he would probably like to work on the case, he had been trying to get the Greek for so long." The county attorney denied making any statement to Officer Traub about contacting Hastings to get him to assist. The substance of the county attorney's testimony, with respect to Hastings participating in the case, is: "Hastings had volunteered himself into the case, I could not very well, whether I wanted him in or not, tell him not to go ahead with the case."

On Saturday morning Hastings contacted Louis Kelly, a newspaper man, and asked him if he wanted a good story. Kelly and Hastings met the Hardenbrook boy in the office of the police judge Saturday night. Hastings introduced himself to the boy and told him he wanted to help the officers and other boys and informed him of the seriousness of the crime. He agreed to help the boy, but not in a finan-

cial way. Hardenbrook testified that Hastings told him he could get a parole and benefit financially. A trap was then set to catch Sam Pappas; Hastings, Kelly and Lindekugel to be witnesses. The Hardenbrook boy was to contact Sam Pappas and induce him to go to a rooming house and have relations with him. There they were to be caught in the commission of the crime. This scheme failed.

By way of explanation, there are two persons in North Platte, each connected in some manner with the restaurant business, by the name of Sam Pappas: Sam A. Pappas, known as "Coney Island" Sam Pappas, and Sam I. Pappas, the proprietor and owner of the Union cigar store and restaurant, who was also known as a local gambler, who had permitted card playing for money in his cigar store. The defendant Hastings, as well as the police officers and others, claimed to know only one Sam Pappas; that is, Sam I. Pappas. Hastings knew Sam A. Pappas as "Tom," and Sam A. Pappas testified that Hastings always referred to him as "Tom." The fact that Tom Gladdis was employed with Sam A. Pappas might have led to the confusion in distinguishing the two men.

Defendant Macomber, 26 years of age, was employed by the city in the capacity of a regular patrolman. He worked four hours in the afternoon and four hours at night, until midnight. He was the driver of the cruiser car, answered red lights and patroled alleys and streets. He drove the cruiser at the time the Hardenbrook boy was apprehended, and testified that Hardenbrook told him at the police station that he had committed the crime of sodomy with one Sam Pappas, who operated a restaurant, and with his brother Gus. Sam I. Pappas also had a brother named Gus, who managed the Union restaurant, while he, Sam I., managed the Union cigar store. Macomber knew only one Pappas and that was Sam I. Pappas. Macomber saw Albert A. Hastings at the police station on the night of November 19, 1937, and he claimed to have had a conversation on the street the morning of November 20 with the county attorney, who is purported to have told him to engage Sam Pap-

pas in conversation and to attempt to have him, Pappas, commit the crime of sodomy with him, Macomber; also to procure two witnesses. All of such testimony is in conflict and rebutted. Macomber testified that he saw Sam I. Pappas at about 8 o'clock in the evening of November 21, and induced him to ride with him in the police cruiser; that during the course of the ride Macomber suggested to Pappas that he, at some future date, indulge in sodomous relations with him, to which he claimed Pappas assented. Sam I. Pappas and witnesses for the state are far from being in accord on this testimony.

On the day in question Sam I. Pappas had dinner at the beet farm which he owned, a few miles distant from North Platte. Later in the day he went to the funeral of a friend in town and stopped at the Union café and had coffee, later returning to the farm. Mrs. Anna Simek, a sister-in-law of Sam I. Pappas, with whom he lived, testified that early in the evening Macomber knocked on a window in her home; she went to the door, and Macomber asked to see Sam, and, when informed he was not at home, told her that when he returned to put a light on in the house and tell Sam that the boys wanted to see him about a card game and wanted to tell him something "for his own good." Later in the evening Sam returned home and had been there a short time when Macomber appeared, about 11:30 o'clock, met Sam and asked him to come along, and Pappas readily consented. Baskins, a city councilman and chairman of the police commission, was seated in the car. It had been his habit to ride evenings in the cruiser, and on this evening he was picked up by Macomber. At this time they all greeted each other pleasantly. Macomber asked Pappas if he was armed; he replied that he was not and never carried a gun. After getting into the car, they drove around for a short time, then stopped at the Ritner Hotel where Macomber lived, occupying room 25. The three men went into the lobby of the hotel together and up a stairway to the first landing, where Macomber called a night clerk and told him to take Baskins and Pappas up to his room and

stay there until he returned. Macomber then left to use the telephone in the lobby and was heard to call Hastings' residence. Finally Hastings appeared, and he and Macomber went up to room 25, and the clerk left. When they entered the room Hastings slipped the bolt on the door, and said "Hello" to both Baskins and Pappas and shook hands with them. This evidence is in conflict. The defendant's witnesses testified that the door was at all times ajar. Finally, Macomber asked Pappas to tell Baskins and Hastings what Pappas wanted to do to him. Pappas is purported to have replied, in substance, that he might have been only fooling, and Macomber stated he knew he was not fooling. Macomber threatened to arrest him and take him to jail; Pappas replied: "There wasn't enough cops on the force to take him." Pappas then attempted to get away and struck Macomber. The exact conversations that took place in the room are at a variance. The version of Pappas is as follows:

After they were seated in the room Macomber said: "Sam, do you know what we got you up here for?" Pappas replied, "No." Macomber said: "You tell us what you done with that boy." Pappas replied that he did not know what Macomber was talking about. Macomber disputed him; Pappas replied: "You are talking to the wrong man altogether, * * * I don't know what you are talking about. * * * If you fellows think I have done something, take me down to the police station or the sheriff's office and I will tell you if I know something." Hastings said: "Come on now cough up." Macomber said: "You are getting smart are you? * * * You had better talk." Pappas replied that he was not going to talk, and Macomber said: "I am going to make you talk." Pappas replied: "If you think you can, hop to it; go ahead." Then Macomber struck him.

Hastings' version of the conversation between Macomber and Pappas is substantially the same as Macomber's; that Macomber told Pappas that he was under arrest and he could go to the police station, but that Pappas replied that if he went to the police station he would go with the sheriff;

that there were not enough policemen on the force to take him. Macomber stated he could take him. Pappas then called Macomber a liar, Macomber got up, Pappas got up and struck at Macomber's mouth and nose; Macomber then struck Pappas, and a fight ensued. Baskins' version of the conversation corroborates both Macomber and Hastings. Pappas claimed that Hastings and Baskins held his arms; that Hastings lost his hold on his arm and held Pappas by his clothing; that Macomber, using vile language, informed Pappas: "You * * * Greeks aint going to run this town, the white people are going to run this town." This language was heard by a guest at the hotel in an adjoining room. He heard the commotion and heard the statement, purported to have been made by Macomber to Pappas, to "sit down * * * I am running this thing." He also heard this language: "Don't hold me, Curley, don't hit me again." With reference to the order to "sit down," the witness heard Pappas say: "I will, I will sit down, I will." He stated that the commotion lasted five or ten minutes.

Pappas testified that Macomber kept striking him in and about the face and head; he did not remember striking Macomber but was attempting to get away. Finally, he did get outside of the room and was standing up against the wall, being pounded by Macomber. There is evidence that Pappas was up against the side of the wall, with his hands down at his side, and his knees sagging, and that he kept saying "all right;" that Macomber kept pounding Pappas with his fists. There is also evidence that Hastings came out into the hall, and that he said: " 'Chet, Chet,' in a serious, cautious way," cautioning him that he was being observed, and that Macomber, after he was warned, "kept on punching; he said, 'I am doing this, I am handling this.' " When Pappas made the attempt to escape from the room, he was apparently dragged back into the room and told to sit down. The striking of Pappas in the hall is testified to by one witness, who also stated he saw Baskins in the hall; that Baskins merely shook his head, did not say anything, and returned to the room.

The testimony for the defense is that Pappas, in attempting to retreat from the room, tripped on the carpet, and that the injuries sustained to his head were caused by his falling against a radiator. The location of bloodstains, of the furniture, and of the radiator in the hall is all detailed extensively in the record and will not be here reviewed. The testimony as to the time actually spent in the room is at variance, the defendant and his witnesses claiming that it did not exceed two minutes.

Finally, the men went downstairs. Pappas was bleeding profusely and wiping blood from his nose and other parts of his head with a handkerchief. He asked to be able to "wash up" but was prevented from doing so. Here, again, the evidence is in conflict as to whether Macomber made a statement that he was the "boss" and was going to take Pappas to jail; whether he struck and pushed Pappas and demanded that he get into the back seat of the cruiser with Hastings, or whether Pappas went voluntarily. When the men arrived at the city jail the Hardenbrook boy was brought out. It is claimed, and denied, that Hastings, Baskins and Macomber remarked to him: "This is the man, this is Sam Pappas," to which the boy replied that Sam I. Pappas was not the man; that it was "a different man altogether, Sam Pappas works in the Coney Island." Macomber and Hardenbrook went for "Coney Island" Sam and returned with him, and the boy stated that he was the man. Then it was suggested by Macomber that he should have a warrant for Sam I. Pappas for resisting an officer, and also for the offense of sodomy based on Macomber's statement, and Hastings said it would be all right for both of the boys to go, meaning Sam A. and Sam I. Pappas; that they would come when they were wanted, and it was suggested that Sam I. Pappas and Macomber shake hands and forget all about the incident. Officer Traub testified that Macomber shook hands with Pappas and "patted him on the shoulder," and he was sent home free, without any police record against him; that while at the police station Pappas said: "Hastings and Baskins treated him like a gentleman," and that Officer Macomber was only doing his duty.

When Sam I. Pappas arrived home, Mrs. Semik awakened her two daughters. They, with Pappas, contacted the sheriff and then went immediately to the hospital, where Pappas remained for eight or nine days. The injuries sustained by him as the result of the assault, and as testified to by the examining physician, may be summarized as follows: Face badly bruised; eyes swollen shut; deep cut, with ragged edges, an inch long over the left eye; slighter cut over same eye; nose skinned; lip cut on right side; inside of cheek bruised on upper right side; lacerations close to the lips; right side of face puffed with air, passing under the tissues and extending over the entire side of head and face to margin of collarbone; portion of air breathed passed through torn tissues under the skin, over the side of the face and neck; lachrymal bone fractured; whites of both eyes red; bump on head back of ear; stitches required to close wounds.

Macomber testified that he at no time struck Pappas with his closed fist. The assault on Pappas, as shown by all of the testimony, was brutal, unwarranted and unnecessary. Throughout the record the insinuation is prominent that Hastings, with the use of his political influence, desired to have charge of the community, and purposely, and in conspiracy with others, sought to drive Sam I. Pappas out of the gambling business and perhaps out of the city for his, Hastings', own personal aggrandizement. We here concern ourselves with the part this defendant played in the case. The use of the third degree, applied by police officers to persons in their custody, can never be tolerated, and confessions obtained thereby are necessarily invalidated because of the nature of the means employed to obtain them. This practice has been condemned by nearly all of the courts, and courts generally are in agreement on this subject. See *Stagemeyer v. State,* 133 Neb. 9, 273 N. W. 824.

That this plaintiff in error was guilty of conduct which richly deserves the condemnation of all good people is not to be denied, but the question for us to decide, and for the state to prove beyond a reasonable doubt, is whether de-

fendant Macomber kidnaped Sam I. Pappas, in violation of the strict terms of the statute and as charged in the information.

"In this state all public offenses are statutory; no act is criminal unless the legislature has in express terms declared it to be so; and no person can be punished for any act or omission which is not made penal by the plain import of the written law." *Lane v. State,* 120 Neb. 302, 232 N. W. 96. See, also, *State v. De Wolfe,* 67 Neb. 321, 93 N. W. 746; *State v. Pielsticker,* 118 Neb. 419, 225 N. W. 51. "It is elementary that penal statutes are inelastic and must be strictly construed. They are never extended by implication." *Weber v. State,* 122 Neb. 369, 240 N. W. 429; *Preston v. State,* 106 Neb. 848, 184 N. W. 925. See also section 29-106, Comp. St. 1929. The foregoing Nebraska cases definitely determine the manner of construing the provisions of criminal statutes in this state.

Section 28-417, Comp. St. 1929, in its entirety, contains possibly four separate divisions that may be stated as follows: First: "Whoever shall kidnap or forcibly or fraudulently carry off or decoy out of this state any person or persons or shall arrest or imprison any person or persons, with the intention of having such person or persons carried out of the state, unless it be in pursuance of the laws thereof, shall be confined in the penitentiary not less than three nor more than seven years." This part of the statute,—take by force and carry off any person into another state for the purpose of imprisonment,—carries a penalty of not to exceed seven nor less than three years. The second provision of this section of the statute is: "Whoever shall unlawfully carry off or decoy, entice away, secrete or imprison any person, for the purpose of extorting from such person or from his or her relatives or friends any money, * * * or for the purpose of compelling the performance of any act by such person," shall be imprisoned in the penitentiary for and during the period of his natural life. The third provision, carrying the same language as the second, contains the further statement, "in furtherance of any such purpose,

do or threaten to do any injury to the person so carried off," etc., shall be imprisoned in the penitentiary for the period of his natural life. The fourth part of said section provides: "Whoever shall threaten to carry off, entice away, secrete or imprison any person for the purpose of extorting money from such person, or from his or her relatives or friends," shall be imprisoned in the penitentiary for not less than one nor more than 20 years.

The dominating element of the offense of kidnaping is the intent with which the acts enumerated in the statute are done. The purpose of the enactment of statutes prohibiting kidnaping is to secure the personal liberty of citizens, to protect the custody of parents or guardians, or other persons having lawful custody of children, also the children. The present statute (Comp. St. 1929, sec. 28-417) was passed in this state immediately after the kidnaping of young Edward Cudahy, where the kidnapers sought ransom for the return of the boy. We find no case that is of direct assistance in determining the adaptability of the facts in the instant case to section 28-417, *supra.* It is apparent that when the legislature enacted section 28-417 it had in mind the unlawful carrying away, decoying, enticing, or imprisoning of any person for the purpose of extorting from such person, relatives or friends any money, property or promise, and for the purpose of compelling the performance of any act by such person.

The state's contention is that the taking of Pappas in an effort to procure a confession, or in an effort to get him to confess to the crime of sodomy, was sufficient when any force was used upon him in that connection. The word "purpose" means that which one sets before him to accomplish. To "compel," within the contemplation of section 28-417, *supra,* means to force; and "performance" means, as the term implies, such other fulfilment of a duty as puts an end to obligation by leaving nothing to be done. While there is apparently great force in the reasoning in the state's brief, we do not believe that the legislature intended, considering the history of the enactment of this

law and the reason therefor, to include a state of facts as exists in the instant case within the section of the statute herein discussed.

In *Holy Trinity Church v. United States,* 143 U. S. 457, 12 S. Ct. 511, it was said: "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. * * * This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act." And on page 463 we find this language: "Again, another guide to the meaning of a statute is found in the evil which it is designed to remedy; and for this the court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body." Citing *United States v. Union P. R. Co.,* 91 U. S. 72, 79. In the latter case it was said: "But courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it. *Aldridge v. Williams,* 3 How. 24; *Preston v. Browder,* 1 Wheat. 120."

In *State v. Clark,* 29 N. J. Law, 96, the court said: "If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity. The court must restrain the words. The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed. 1 Kent's Com. 462; *Commonwealth v. Kimball,* 24 Pick. 370; *United States v. Fisher,* 2 Cranch, 400; 1 Bl. Com. 60." And in *United States v. Kirby,* 7 Wall. (U. S.) 482, it was said: "All laws should receive a sensible construction. General terms should

be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter." The circumstances under which the statute in question was passed and the purposes to be accomplished by it, in its scope and effect, are inconsistent with the position taken by the state.

It would seem apparent that section 28-417, Comp. St. 1929, is not all-inclusive; that is, to cover other offenses provided for by different sections of the statute, and the application of its provisions to the facts in the case at bar meets this objection raised by the plaintiff in error. With the severity of the penalty we are not concerned, and we acknowledge that it is privileged only to the legislature; but the intent of the legislature in enacting section 28-417 is of immediate concern, and it does not contemplate the crime of kidnaping, considered in the light of the facts in the instant case.

The only case to reach this court since the enactment of section 28-417, *supra,* is *Brown v. State,* 111 Neb. 486, 196 N. W. 926. Both plaintiff in error and the state cite this case as sustaining their respective contentions. Briefly, the facts are these: Brown picked up two young women; they requested that he let them off at Krug Park. He intentionally took them several miles beyond Krug Park to his shack; there chained and imprisoned them in a hole, four feet deep, six feet long, and two feet wide, for the purpose of compelling the women to have sexual relations with him. Under such circumstances he completed the act of sexual intercourse. He then permitted his captives to go into the attic of the shack and threatened their lives if they made an outcry. They saw a person passing nearby, made an outcry and pursuit of Brown followed. He was apprehended, charged with and convicted of kidnaping under section 28-417, Comp. St. 1929. It is noted that Brown, by his act, completed every necessary element of the offense charged

under said section of the statute. Again referring to the statute, it indicates clearly that the person perpetrating the act has the commission of a crime or an unlawful act in mind at the time. Otherwise, this statute must of necessity catch the innocent as well as the guilty. The evidence in the instant case does not warrant the conclusion that the assault on Pappas was planned by, intended, or was within the original contemplation of, Macomber, on duty and fully uniformed as a police officer, at the time he asked Pappas to accompany him and later took him to the Ritner Hotel. What Macomber intended was to give Pappas the third degree and endeavor to have him confess to the crime of sodomy in the presence of two witnesses, Baskins and Hastings. It is claimed that his reward would be the enhancement of his prestige in clearing up this offense and have a tendency to advance him in the police service of the city. The evidence does not warrant the conclusion that when the men entered the hotel room they intended to detain and assault Pappas until such time as they finally forced a confession to the crime of sodomy. Pappas voluntarily stayed in the room for some period of time when he would have been privileged to leave. He finally escaped from the room, was free for a time in the lobby of the hotel, accompanied the men to the police station, and there he was released and returned home.

For the reasons given, we conclude that the charge of kidnaping should not have been submitted to the jury, and in its submission the trial court erred.

With reference to the assignment of error as to compelling the complaining witness, Sam I. Pappas, to submit to a puncture of his spine, fluid to be taken therefrom and subjected to a chemical analysis for the purpose of determining the extent of the effect and the ravages of the disease of syphilis on his nervous system, and as affecting his sight and hearing, examination was permitted by the court and was made, with the exception of the spinal test. The physician said that the examination was not complete without such a test and that it would be harmless. Pappas

refused to submit to the test. A request was made to the court to compel him to so submit. Then the evidence discloses the history of the syphilis suffered by him, as found by the Mayo Clinic, and that Pappas did not object to its use. The contention of the defendant is that he was entitled to prove by a spinal test that the defects in the eyesight and hearing were caused by the disease and not by the assault, on the theory that, when plaintiff in error offered evidence as to the physical or mental condition of Pappas, section 20-1207, Comp. St. 1929, applied.

The trial court, under the prevailing rule, has the power to require the plaintiff in a personal injury action to undergo a physical examination at the request of the defendant. Such right on defendant's part is not considered absolute, and the matter is within the discretion of the trial court when such discretion is free from palpable abuse. See *Ziskovsky v. Miller*, 120 Neb. 255, 231 N. W. 809.

We next refer to the charge of assault with intent to inflict great bodily harm, which resulted in a conviction of assault and battery against the defendant. This court in *Pembrook v. State*, 119 Neb. 417, 229 N. W. 271, said: "The precise question is whether a conviction of a lesser offense than that for which the accused was informed against is a bar to further prosecution for the greater offense if the accused is granted a new trial. Nebraska is committed to the position that the defendant cannot benefit by the verdict of the jury, if he chooses to appeal from it." This court held: "A conviction of a lesser offense than that for which the accused was informed against is not a bar to a prosecution for a greater offense if the accused is granted a new trial." See, also, *Clarence v. State*, 89 Neb. 762, 132 N. W. 395. The fact that the above cases are homicide cases does not alter the principle of law, in so far as it affects the subject-matter of the count, in the instant case, of assault with intent to inflict great bodily harm, and incorporated therein assault and battery.

Other assignments of error need not be discussed in view of our holding. Upon a retrial of this case, we believe the

court will correct such errors that may be apparent, and that defendant will have a fair and impartial trial.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.

ROSE, J., dissenting.

The information was in proper form and accused defendant of violating the kidnaping law, which provides that whoever unlawfully entices away, secretes or imprisons any person for the purpose of compelling the performance of any act by such person, is, upon conviction, punishable for kidnaping by imprisonment for life. Comp. St. 1929, sec. 28-417.

When this law was enacted, contemporaneous history showed that the art of kidnaping had progressed to the point where a helpless victim was tortured by the threat his eyes would be gouged out if he failed to write and sign a letter containing the threat and address it to parent, brother, sister or other relative. The law was intended to protect the victim, his relatives and the public generally. The penalty for kidnaping was adapted to the atrocity of the crime.

In this prosecution competent evidence proves beyond a reasonable doubt the following facts or proper inferences therefrom as found by the jury in their verdict of guilty: The three defendants named in the information, Macomber, a policeman of North Platte, Baskins, a member of the city council, and Hastings, a boss in city politics, conspired together to compel Sam I. Pappas, who had been permitted by them to operate a gambling den, to confess to a felony of which he was innocent—a confession which, if made, might subject him to imprisonment in the penitentiary for 20 years and perhaps for life. The motive for the purpose to compel the confession was to get rid of Pappas and procure profits from gambling. Macomber and Baskins drove to the home of Pappas in a police cruiser not long before midnight, Sunday, November 21, 1937. Macomber intimated that something for the good of Pappas was con-

templated and the latter readily consented to leave home in the cruiser with the city officials. He had not been accused of any offense and there had been no warrant for his arrest. He was not told he was under arrest. He was taken to Macomber's room 25, in the Ritner Hotel, without knowledge of what was in store for him there. Hastings was promptly called to the hotel by telephone and, while the four men, Macomber, Baskins, Hastings and Pappas, were in room 25, with the door closed and bolted on the inside, Macomber made a demand on Pappas to confess his guilt of a lawless act of degeneracy. The latter asserted his innocence and refused to confess. Threats to make him do so were loud and profane. To compel such a confession Baskins and Hastings held Pappas while Macomber beat him. Pappas tried to escape, unbolted the door and got into the hall outside, was beaten there, dragged back into the room where the beating was continued. These inhuman atrocities did not compel Pappas to confess guilt. After the beating and turmoil ceased in room 25 with the departure of the four occupants, there was blood on the walls, on the floor, on a rug in front of the bed, on the bedspread, on the drapes, on the walls of the hall and on the radiator. Physical injuries inflicted on Pappas as described by an examining physician and as related in the majority opinion were:

"Face badly bruised; eyes swollen shut; deep cut, with ragged edges, an inch long over the left eye; slighter cut over same eye; nose skinned; lip cut on right side; inside of cheek bruised on upper right side; lacerations close to the lips; right side of face puffed with air passing under the tissues and extending over the entire side of head and face to margin of collarbone; portion of air breathed passed through torn tissues under the skin, over the side of the face and neck; lachrymal bone fractured; whites of both eyes red; bump on head back of ear; stitches required to close wounds."

Unsteady on his legs, his face smeared with gore, Pappas was denied the privilege of washing away the blood and in that condition was taken to the police station and

confronted with the pervert who was asked to identify him as a companion in criminal depravity. The identification was refused. Pappas was not the guilty man. He was released, taken home and to the hospital without being accused of any violation of law.

The defense that what occurred in room 25 was a fist fight started by Pappas is too preposterous for belief and the jury wisely disregard testimony in support of it. Macomber at the time was a police officer in uniform and was armed. He was assisted by Baskins, a member of the city council, and by Hastings, a political boss who gave orders to police officers at the police station—orders that were obeyed. Pappas was known in advance to be unarmed. His eyesight was impaired and he was weakened by a disease of long standing. He was imprisoned by these enemies of law and order and was helpless in their presence. Officialdom and bossism gave them no immunity from their lawlessness. In legal conduct of public duty officers of the law are not in danger of prosecution for kidnaping. The facts narrated and the necessary inferences therefrom were clearly shown beyond reasonable doubt by competent evidence which the jury believed.

My understanding of the facts and the law is that the state in the prosecution of Macomber proved beyond a reasonable doubt every element of kidnaping as defined by statute—enticing Pappas away from home, transporting him to room 25 in the Ritner Hotel, imprisoning him therein and beating him in the manner indicated for the purpose of compelling him against his will to confess guilt of a felony. Each of these acts was unlawful and all together with criminal intent amounted to kidnaping. Such a confession, if compelled, would have been an "act" within the meaning of that word as used in the kidnaping statute. Pappas evidently preferred death to the making of such a confession. The accomplishment of the unlawful purpose of Macomber to compel a confession was not necessary to a conviction. On the issue of felonious purpose or intent in a criminal prosecution, an adult sane person may be presumed

to intend the natural and probable consequences of his voluntary acts. Criminal intent or felonious purpose was proved by circumstances and acts of accused in furtherance of the felony charged. The length of time kidnapers detain or imprison their victim, forcibly and against his will, is immaterial in a prosecution for kidnaping.

The kidnaping statute is in plain, unambiguous language and needs no construction. I do not agree with the majority that enforcement of the kidnaping statute according to its literal terms led to injustice, oppression or absurdity invalidating the conviction. I examined the entire record with care and I did not find any error in the proceedings below or in the sentence of the district court to justify the acquittal of Macomber on the charge of kidnaping.