LOYD CARROLL GRANDSINGER, PLAINTIFF IN ERROR, v.
STATE OF NEBRASKA, DEFENDANT IN ERROR.

73 N. W. 2d 632

Filed December 16, 1955. No. 33663.

*Charles A. Fisher,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Robert A. Nelson,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff in error, Loyd Carroll Grandsinger, hereinafter called defendant, was charged with murder in the first degree by shooting and killing one Marvin Hansen, a Nebraska safety patrolman, on April 8, 1954, in Cherry County, Nebraska. Defendant pleaded not guilty, and after trial to a jury in the district court it returned a verdict which found defendant guilty of murder in the first degree and fixed the penalty at death. Defendant's motion for new trial was overruled, whereupon judgment and sentence in conformity with the verdict were rendered. Therefrom defendant prosecuted error to this court. Errors assigned and discussed are substantially as follows: (1) That the evidence was insufficient to support the verdict and judgment or justify the death penalty; (2) that the trial court erred in the admission of certain evidence; (3) that the prosecutor in argument was guilty of misconduct prejudicial to defendant's rights; (4) that the trial court erred in giving and refusing certain instructions; and (5) that in the event of affirmance, the verdict and judgment

should be modified to reduce the sentence under the provisions of section 29-2308, R. R. S. 1943. We conclude that the assignments should not be sustained.

There is competent evidence in the voluminous record from which the jury could have concluded beyond a reasonable doubt as follows: At the time of the alleged commission of the crime in Cherry County, Nebraska, about 11:30 p. m., April 8, 1954, defendant was 21 years of age, with the equivalent of a tenth-grade education. He was born at Valentine, Nebraska, but had been living at Bell Gardens, California, a suburb of Los Angeles, where he had been employed as a receiving clerk. He was married and had one child about 14 months old at time of trial. However, about a month previous to April 3, 1954, he had separated from his family because of marital difficulties. On April 3, 1954, out of employment and with little cash, defendant left California in his own 1941 Ford car and started east. Defendant's brother Leon, 32 years old, left with him. Prior to leaving, defendant took a gun, a .22 cylinder pistol, from a trailer house belonging to a friend. Defendant's car was not in good condition, and at various points along the route they worked upon it. Also along the route they prowled and pilfered several cars from which articles were stolen. Eventually defendant's car would barely run, so at some point in Wyoming they stole a 1952 or 1953 Ford car, behind which they towed defendant's car the rest of the way while one of them guided it, because to leave it would be a dead give-away. They started the stolen car by direct wire from battery to coil. In that regard, defendant said, "there wasn't a car he couldn't get into in two minutes." A second .22 cylinder gun, almost identical with that taken by defendant, was also stolen by them either from one of the prowled cars or from the stolen car, so that each one of them had a loaded gun, which carried nine .22 long rifle cartridges, in his possession, with extra such car-

tridges to use in them, and they engaged in target practice.

After stealing the car and numerous other items including the guns, they drove on to Valentine, Nebraska, thence to a point south and east of Springview where they stopped at a hay lot and worked on defendant's car. From there they drove to a point southeast of Wewela, South Dakota, and parked defendant's car about 100 yards off the highway along a creek. Thence they drove to a farm where defendant stole a tire and they stole 25 or 30 gallons of gasoline, some of which they took along with them in cans taken by defendant from a pick-up truck.

On Wednesday evening, April 7, 1954, about 8:30 p. m., they arrived at the home of an acquaintance, Bud Frederickson, located a few miles east of the Cherry County line. Both Bud Frederickson and his brother Fred were there at the time. Bud testified as a witness for the State. Defendant and Leon while there together both visited with the Fredericksons quite a while, as much as 2½ or 3 hours. Among other things, they bragged of their prowess, and Leon asked the Fredericksons if they wanted a pheasant which defendant had shot from the car window with one of the .22 pistols as they were driving along the highway in South Dakota. Leon told the Fredericksons, "Don't tell anyone that we are even in the country" because "I am wanted for parole violation that I jumped, and some bad checks that I gave." He then took one of the .22 cylinder pistols out of the stolen car, showed it to them, warned that it was loaded, refused to sell it, and put it back in the car. Also, defendant and Leon attempted to sell the Fredericksons some second-hand clothing, tires, and tools which they had in the stolen car. When asked where they got the tools, defendant answered, "That is a racket man, it is easy to get tools." When asked where they got all those clothes, Leon said, "it was a racket

it was easy to get clothes." As a matter of fact, they were admittedly stolen along the way.

Defendant and Leon then told of having another car. They wanted to change motors because the car they were then driving was stolen by them, as they then said, east of Las Vegas, Nevada, where defendant's car broke down. They stated that they intended to change motors, pour gasoline over the body of the stolen car, and burn it in order to destroy the evidence, then take defendant's car to Council Bluffs, Iowa, have the motor numbers ground off, and get a title thereto so they could sell it. They asked permission to use Fredericksons' barn or to go out in their canyons and so change motors and burn the evidence, but that was refused. They then talked about going up to Henry Johnson's place in Wewela, South Dakota, where they once lived, and use the barn and cellar there to change motors. When asked what if Johnson "walks up on you" they replied, "We will be able to talk him out of it and if he doesn't and can't talk he won't get away until we are done with him." However, the Fredericksons finally convinced defendant and Leon that they should take the cars out in the sand hills where they could more safely change the motors and burn the body of the stolen car. It then was arranged that defendant and Leon should come back the next night at 10 p. m., bring defendant's car along, and the Fredericksons would show them the way west as far as the game refuge, from which point they would be on their own. When Bud Frederickson asked what they would do if some one came riding up on horseback out there in the sand hills, defendant said, "we will watch that, we will be down there in the brush." When asked, "Well, what will you do, you got a gun" defendant said, "we will bluff them out and if we can't bluff them out we won't let them get away."

When defendant and Leon left the Fredericksons' place, they drove to Wewela, South Dakota, where defendant broke a window in the door, and opening it, they

burglarized a store and the United States post office, stealing therefrom food, clothing, tools, other merchandise, and cash. They then drove back to Bud Frederickson's place, arriving there about 5:30 a. m., Thursday, April 8, 1954. The back of the stolen car "was clear full of something" and Leon asked Bud if they could unload some groceries admittedly obtained by robbing the store at Wewela. Bud refused to let them unload the merchandise but told them there was a place down by the river where they could hide the stuff and they could pick it up that evening when they returned. They ate part of the food, then hid the stolen merchandise in a ravine some distance back of a schoolhouse located on the river road. However, two cigar boxes, containing the money admittedly taken from the store and post office at Wewela, were kept in their car. They then went to the home of a person for whom defendant had worked in 1951, where they had breakfast and dinner, visited, and slept before leaving in late afternoon. From there they drove by a roundabout way to the place where defendant's 1941 car had been left, and, hitching it behind the stolen Ford, drove back to Fredericksons, arriving at about 10:10 p. m., as previously arranged.

In the meantime, after defendant and Leon had left Fredericksons' place on the morning of April 8, 1954, the Fredericksons had gone to Valentine and reported to the Cherry County sheriff and state safety patrolman Marvin Hansen the information which they had obtained with regard to the unlawful conduct of defendant and Leon. Pursuant to prior arrangements, defendant and Leon, having arrived at Fredericksons' place that evening, the Fredericksons directed them along a road which took them to a place near Berry hill on highway No. 7, where the fatal shooting of the patrolman took place. As previously arranged, the Fredericksons were presumably showing defendant and Leon a way to the sand hills where they could remove the motor from the stolen car, burn the body, and place the motor therefrom in defend-

ant's car. The Fredericksons led the way in a car owned by Fred from which the bulb in the left taillight had been removed in conformity with instructions given by the sheriff and patrolman. Their car was followed by Leon driving the stolen car with lights on, and towing defendant's car which defendant was guiding without lights.

That evening about 9 p. m. the sheriff and patrolman, the mayor of Valentine, the chief of police, and a police officer from Valentine, all drove to the vicinity of Berry hill. The sheriff and patrolman went in the sheriff's car, driven by him. That car was equipped with two headlights, also two red lights on the front of the car which blinked on and off, a siren, a two-way radio, and a portable spotlight which was powered by plugging the end of its 7-foot cord into the lighter socket. A road block was set up at Berry bridge where the mayor and two police officers remained. The sheriff and patrolman then drove north on the highway in the sheriff's car for about one-eighth of a mile, where they turned around facing south, and waited for some period of time before they saw the headlights of two cars coming from the east. Such cars turned south on highway No. 7 and the officers noted that the left taillight of the first car was out and that two cars were following with headlights only on the first car. When such cars had passed, the sheriff communicated by two-way radio with the officers at Berry bridge, then started his car, and with lights off drove out on the highway. After driving out upon the highway, the sheriff turned on his lights, including the blinking red lights, and started the siren on his car. He so stayed behind the stolen car driven by Leon and defendant's towed car guided by defendant until they slowed down and stopped on the right or west side of the highway headed south. There the sheriff stopped his car on the left or east side of the highway after turning it a little toward the west so that his lights would shine on both the other two stopped cars. The Fredericksons

drove on down the highway and home. At the time such cars stopped, the patrolman had the portable spotlight on and was holding it in his hand as he sat on the right side of the sheriff's car. There are exhibits in the record showing the position of the three cars after they stopped. As a matter of fact, photographs received in evidence show the location of the cars and the position of the sheriff, patrolman, and defendant as they alighted therefrom. Such locations and positions were fixed by defendant himself on April 10, 1954, when he voluntarily made a statement to officers at the scene of the tragedy.

As the cars stopped, Leon was seen sitting in the driver's seat of the stolen car with his left hand on the steering wheel and one of the stolen .22 pistols in his right hand. Defendant was seen sitting in the driver's seat of his towed car. Thereupon, the sheriff jumped out on the left side of his car and the patrolman jumped out on the right side thereof. Each of them held a .38 revolver, identical except for serial numbers. The patrolman was dressed in a well-marked regulation uniform with cap, Sam Browne belt, and official badge. Both defendant and Leon well knew that the sheriff and patrolman were officers. Leon opened the left door and swung his feet out, gun in hand, but obeyed the sheriff's orders to drop the gun and come out with hands up, whereupon the sheriff handcuffed him and chained him to defendant's car. The .22 pistol, loaded with long rifle cartridges which had been in Leon's hand, was thrown back on the seat of the stolen car and taken care of by the sheriff or other officers. It was never fired that night, and the only other .22 pistol at the scene was the one in defendant's possession.

As the patrolman jumped out on the right side of the sheriff's car, defendant reached for and obtained the other .22 pistol hidden in his car, and instead of coming out the left door with his hands up as commanded, defendant opened and came out of the right door, thus

placing himself between his car and the patrolman. Defendant had his gun, loaded with .22 long rifle cartridges, in his right hand, concealed down by his side. As the patrolman walked out into the highway telling defendant to follow him on back, defendant came around the corner of his car where he could see the patrolman, then started running toward the west. Twice the patrolman told defendant to "stop" but he paid no heed, and running, fell into a west roadside ditch. The patrolman then twice told defendant to "get up" but there was a pause and defendant shot the patrolman and ran on west, followed by the patrolman for some 200 feet from the sheriff's car, where the patrolman was later found lying on the ground face down, unconscious, gravely and mortally wounded by a .22 bullet. The patrolman's gun was found lying just to the left of his body, with all cartridges therein discharged except one. Defendant escaped and contended in his testimony that as he came around his car, the patrolman fired into the ground and defendant ran away because he was frightened. He claimed that if he shot the patrolman, which he denied, that his .22 pistol was discharged accidentally when he fell; or, that things blacked out, and, because of his mentally insane condition and the strain, he didn't know what he was doing; or that in any event he didn't know the patrolman was an officer, and shot in self-defense. However, there was ample competent evidence that defendant knew the sheriff and patrolman were officers; that defendant's .22 pistol was fired first; and that after a pause there were .38 and other .22 shots fired which gradually got farther away from the cars toward the west after each shot. In any event, all of defendant's defenses aforesaid were submitted to the jury in a manner entirely proper and favorable to defendant.

As defendant and the patrolman ran west, the sheriff called over his two-way radio to the officers at Berry bridge, asking for immediate help. When they came

down to the cars, a police officer was left in charge of Leon while the sheriff and other officers went to look for defendant and found the patrolman. Even after finding the patrolman the officers heard two .22 shots fired from the west and north. It will be noted that at all times all persons at the scene were east thereof except defendant, and no other .22 except defendant's was fired that night.

The officers, upon locating the patrolman, examined his body and found a bullet hole in the area where it had passed through his pants belt and entered his body. He was thereupon placed on a stretcher and the sheriff took him to a hospital in Valentine, where a physician previously called examined the patrolman and found that he was dead. His examination disclosed a small penetrating wound in the area where a bullet had passed through the patrolman's Sam Browne belt, pants belt, and trousers, then entered his body to the left and above the left-hand side pocket, and then came out of his body, naturally forming a larger hole on the right side below the outer edge of his right hip pocket. A post-mortem examination disclosed that the bullet had passed into the patrolman's body at an upward angle, then perforated his aorta, a main artery which travels from the heart down through the chest and abdominal cavity. The bullet also pierced a kidney and upon being deflected downward by his ribs, came out of his body. After diligent search the bullet was never found. From such examination the physician concluded that the wound was caused by a bullet, and that death was caused by progressive loss of spurting blood from the aorta into the peritoneal cavity. The physician gave his opinion that it was a wound which could have been produced by a .22 bullet, certainly not by a .38 or larger bullet. He found that the perforation in the aorta was only pencil-tip size, and could not have been caused by a .38. He also testified that the impact of such a wound from a .22-caliber gun would not have caused

great pain, discomfort, or immediate collapse as a larger bullet would have done, and would not have prevented a man the size of the patrolman from running a distance of 200 to 250 feet immediately after receiving the wound before he would fall. Further, it was established by the undisputed testimony of gun experts that the holes in the patrolman's Sam Browne belt and pants belt were caused by a .22 bullet and could not have been caused by a larger one. Further, such belts were received in evidence and an examination thereof by the jury would make such conclusion self-evident.

After the patrolman had been removed from the scene of the shooting, the chief of police brought Leon to the police station at Valentine. Also, the mayor drove the stolen Ford while a police officer guided defendant's towed. car into Valentine where they were stopped behind the courthouse. There a written inventory was taken of numerous articles found in the cars. It included a skeleton key, numerous tools both in a box and outside thereof, clothing for both men and women, 3 flashlights, 3 trouble spotlights, a gun holster, 15 packages of cigarettes, a brief case, an electric iron, a glass fish pole, 2 boxes of Christmas tree lights, a camera, a 1953 California car license plate, a suitcase, and other items including 1 full box and a few extra .22 long rifle cartridges found in defendant's car and three-fourths of a box of such cartridges found in the stolen car. Further, two cigar boxes containing money identified by defendant as having been admittedly taken by defendant and Leon from the burglarized store and post office at Wewela, South Dakota, were also previously found in such cars. Certain other items aforesaid were identified by defendant as having been stolen from other cars while they were traveling east from California.

Defendant having escaped, a posse was organized at the courthouse in Valentine, and he was apprehended about 8 a. m., April 9, 1954. He was first sighted by members of the posse about 80 rods from the home of

his former employer where defendant and Leon had visited, eaten, and slept the day before. When defendant saw the armed posse he jumped into the river and started to swim across, but the current was too swift and he was persuaded by his former employer to surrender. When certain patrolmen arrived upon the scene, defendant was searched, handcuffed, placed in a patrolman's car, and taken to the jail at Valentine. When searched, nine .22 long rifle cartridges which would fit defendant's gun were found in defendant's pockets. The .22 pistol which he had when he left the scene of the shooting was never found. It was admittedly thrown away or lost by defendant in his flight.

During the afternoon of April 9, 1954, defendant voluntarily made and read a written confession which, by interlineation, was corrected in certain particulars by defendant in his own handwriting and signed by him on each page thereof in the presence of three witnesses who signed as such. Again, on April 10, 1954, defendant voluntarily gave another transcribed similar statement at the scene of the crime during which he placed the cars, himself, the sheriff, and the patrolman in the positions where they were located at the time of the shooting, and demonstrated what happened there. Again, on the afternoon of April 11, 1954, defendant voluntarily made and read another written confession which also, by interlineation, was corrected in certain particulars by defendant in his own handwriting, and was signed by him on each page thereof in the presence of two witnesses who signed as such. Further, such confession was subscribed and sworn to before a post-office inspector who as such acknowledged same.

Defendant in his testimony claimed that the confessions aforesaid were not voluntarily given, and equivocally denied that he had made several statements contained therein. However, those were matters for determination by the jury under appropriate instructions given by the trial court.

The record discloses beyond dispute that between April 3, 1954, and April 8, 1954, defendant and Leon committed the crimes heretofore recited and were fugitives from justice of at least Wyoming and South Dakota and perhaps other states as well between California and Nebraska; and that they were guilty of at least two federal offenses of stealing and transporting a car across state lines and burglarizing the post office at Wewela, South Dakota. At the time of the alleged offense defendant and Leon were on their way to a hide-out in the sand hills to remove the motor from the stolen car, place it in defendant's car, and then burn the remains of the stolen car in order to destroy the evidence. Their cars were then loaded with stolen merchandise, and each of them then had a stolen .22 pistol loaded with .22 long rifle cartridges in his possession. The evidence fully justifies the conclusion that they were aware of the serious consequences of arrest and had armed themselves in order to kill any person who attempted to stop them, and that defendant shot and killed the patrolman in order to escape. In other words, when the patrolman attempted to arrest him, defendant purposely and deliberately carried out his premeditated plan and shot and killed the patrolman. In the light of the foregoing, we conclude that the evidence was amply sufficient to support and sustain the verdict, judgment, and sentence.

In that respect, the applicable and controlling rules are: "It is not the province of this court to resolve conflicts in the evidence in law actions, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Those matters are for the jury.

"In a criminal case, this court will not interfere with a verdict of guilty based upon the evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt." Spreitzer v. State, 155 Neb. 70, 50 N. W. 2d 516.

Defendant argued that the trial court erred in admitting part of a conversation which defendant had with a sheriff from South Dakota who was a friend of defendant and present when defendant made a confession on April 11, 1954. The conversation is too long to set forth here. It is sufficient for us to say that the trial court admitted it solely for the limited purpose of helping the jury decide whether or not such confession was voluntary, and the jury was so cautioned by the court. Defendant, in his objections to the conversation said that, "even though it might tend to" so assist the jury, such conversation was inadmissible because it related in part to another crime previously committed by defendant. In that regard, defendant testified at length about such conversation, and, even assuming that a part thereof offered by the State was erroneously admitted, it could not have been prejudicial to defendant's rights. We find no prejudicial error in admission of the evidence under the circumstances.

Defendant also objected to the admission of other evidence adduced by the State which related to commission of the other crimes for which defendant had never been apprehended or tried, and which were allegedly committed by defendant between April 3, 1954, and April 8, 1954, the date upon which the patrolman was killed. We have heretofore discussed the evidence with relation thereto, and it will not be repeated. For like reasons, defendant also objected to the opening statement of the prosecutor with regard to what the State expected to prove with relation thereto and contended that such was misconduct requiring reversal. The trial court overruled defendant's objections and motions for mistrial upon the ground that the evidence was admissible solely and only for the limited purpose of determining whether or not defendant had a motive or intent to shoot the patrolman. Upon the admission of such evidence the trial court upon several occasions so orally admonished the jury, and again in the instructions it was made

crystal clear that defendant could not be convicted of the crime charged by proof of the commission of some other crimes or wrongs, but that such evidence, if believed, should be considered by the jury solely for the purpose of determining defendant's alleged motive, intent, malice, deliberation, and premeditation. We decide that under the circumstances such evidence was admissible for such limited purpose, and as a matter of course it follows that the prosecutor was not guilty of misconduct in making his related opening statement.

In that connection, Fricke v. State, 112 Neb. 767, 201 N. W. 667, held: "As a general rule, evidence of other crimes than that with which the accused is charged is not admissible in a criminal prosecution." However, there are exceptions to such rule. In Swogger v. State, 116 Neb. 563, 218 N. W. 416, this court held: "Except as to crimes having an element of motive, criminal intent, or guilty knowledge, evidence of separate and distinct offenses committed by accused is not admissible. If such evidence is admitted, and is prejudicial, a conviction cannot stand." In the opinion it is said: "Only in crimes involving motive, intent, or guilty knowledge may evidence of independent crimes, wholly disconnected with the one charged, be received."

In Stagemeyer v. State, 133 Neb. 9, 273 N. W. 824, this court held: " 'It is a general rule that, on the trial of one accused of crime, proof of distinct and independent offenses, even of a similar nature, is inadmissible. To this rule there are exceptions; but, in order to make evidence of other independent offenses admissible, it must appear that the evidence offered falls within one of the recognized exceptions.' Abbott v. State, 113 Neb. 524, 206 N. W. 153." See, also, Hertz v. State, 160 Neb. 640, 71 N. W. 2d 113.

In the case at bar, defendant was charged with murder in the first degree, that is, that he purposely and of deliberate and premeditated malice shot and killed the patrolman. The defenses claimed by defendant have been

heretofore recited. It therefore appears that defendant's motive, criminal intent, and guilty knowledge were important elements from the inception of the trial. Thus, it was important and proper for the State to adduce evidence that defendant had committed such other crimes for which he had never yet been apprehended or tried on account of which he was a fugitive from justice, for the purpose of tending to prove that defendant feared arrest, and therefore had a motive for and did intentionally shoot and kill the patrolman in order to effect an escape. Voluminous competent evidence supports that theory.

There are numerous authorities involving comparable situations wherein law enforcement officers were killed which support the foregoing conclusions. In that regard, see, Shelton v. State, 106 Ohio St. 243, 140 N. E. 153; People v. Middleton, 65 Cal. App. 175, 223 P. 448; Sullivan v. State, 163 Ark. 11, 258 S. W. 643; Lawrence v. State, 29 Ariz. 247, 240 P. 863, certiorari denied 269 U. S. 585, 46 S. Ct. 201, 70 L. Ed. 425; Harden v. State, 211 Ala. 656, 101 So. 442; People v. King, 276 Ill. 138, 114 N. E. 601; State v. Calloway, 174 La. 134, 140 So. 2; Eagles v. United States, 25 F. 2d 546; People v. Slater, 199 Cal. 357, 249 P. 177. For discussion of comparable propositions of law under distinguishable facts and circumstances, see, Haunstine v. State, 31 Neb. 112, 47 N. W. 698; Clark v. State, 79 Neb. 473, 113 N. W. 211; and Jurgensen v. State, 135 Neb. 537, 283 N. W. 228.

Also, contrary to defendant's contention, the situation here was not an attempt to prove the bad character of defendant prior to his putting that question in issue. The evidence was received solely and only for the limited purpose heretofore set forth, and the jury was so instructed. Further, it was not admitted for any purpose of impeaching defendant's testimony by showing previous felony convictions. Therefore, contrary to defendant's contention, section 25-1214, R. R. S. 1943, had no application.

Defendant argued that the trial court erred in admitting evidence that shortly before the alleged killing defendant admittedly shot a pheasant with a .22 pistol here involved from one of the cars while it was in motion traveling along the highway in South Dakota. Such evidence was admitted for the sole and limited purpose of showing that defendant had such a pistol at that time and his ability to use it. The trial court so affirmatively instructed the jury and defendant's contention has no merit.

Defendant's wife was called as a witness in his behalf. She testified that prior to the time defendant left California they had been separated for about a month, but that on April 2, 1954, she had seen defendant and a reconciliation looked favorable. She also testified that on New Year's Eve, 1952, defendant had received a severe beating by some young men in Omaha, as a result of which defendant had since had lapses of memory and black-outs, which were reasons, among others, for their marital difficulties. Defendant himself also testified with relation to such beating, which allegedly affected his physical and mental condition, causing him to have mental lapses and black-outs which played quite a part in their marital troubles, but that he had talked to his wife about seeing a doctor and promised to do what he could to improve his mental condition. He also testified that on the night of the shooting things blacked out because of his mental condition, and he could not remember what happened part of the time. Thereafter defendant was asked on cross-examination: "Now, as a matter of fact you were going to divorce your wife to marry a women down here in Omaha, weren't you?" Without objection defendant was permitted to answer, "No, sir." For the purpose of impeaching such testimony of defendant and of his wife aforesaid, and also for the limited purpose of assisting in a determination of defendant's mental condition, the State, over defendant's objections, produced three letters admittedly writ-

ten by defendant to a named woman in Omaha. Upon proper foundation laid, they were received in evidence over defendant's objections. They appear as exhibits Nos. 67, 68, and 70. The prosecutor then said, "May it please the court, I need to read these exhibits to the jury for the limited purpose for which they are received." Whereupon counsel for defendant said, "Before he reads them to the jury will the court tell the jury that they are for the limited purpose for which they are received." Thereupon the court said: "Yes. Gentlemen as I said before a person can never be proved guilty of one charge by proving some other wrong. Sometimes evidence of other matters are received for a limited purpose. The State has offered this evidence and it is received for the limited purpose of going to show the defendant's mental condition—the question of his blackouts and his mental condition and possible motive, if it does have any bearing on it. You can consider it for no other purpose and if it doesn't throw any other light on those questions you should ignore the evidence entirely, and you are not only directed to but you are instructed to and will be instructed on that and I caution you to observe that instruction." Previously also, during foundational questions upon like request by counsel for defendant, the trial court had made an almost identical statement to the jury. Defendant is in no position now to argue that the court by so doing erroneously gave oral instructions to the jury in violation of sections 25-1111 and 25-1115, R. R. S. 1943. Further, instruction No. 16 given by the trial court instructed the jury with regard to the limited purpose of such evidence by use of language comparable to such oral admonitions. In that connection also, defendant argued that in several other respects too voluminous to repeat here, the trial court erroneously gave oral instructions. That contention has no merit. As stated in 64 C. J., Trial, § 582, p. 643: "A statute requiring that instructions be in writing is not to be construed as to require the court to reduce to writing all

the admonitions which it may be proper to give the jury while the trial is in progress." As stated in § 584, p. 644: "Subject to the general rules, it has been held that the court may orally give its opinion on a motion to exclude testimony; in ruling on the admissibility of evidence, explain the rulings; state for what purpose evidence is admitted; limit its application; or direct the jury to disregard it; * * *." See, also, 88 C. J. S., Trial, § 330, p. 867; Lee v. State, 147 Neb. 333, 23 N. W. 2d 316; Rakes v. State, 158 Neb. 55, 62 N. W. 2d 273. Such rules are applicable and controlling here.

Exhibit No. 67, dated March 22, 1954, and exhibit No. 68, dated April 1, 1954, were two letters contained in the same envelope, exhibit No. 69. They were written in Los Angeles but mailed to the woman in Omaha on April 2, 1954, from Bell, California. Insofar as important here, defendant stated therein that his wife was not going to sue him for divorce, so, having sufficient legal grounds, since his wife was to blame, he was going to divorce her. He urged the woman to come to California and get a job so they could be together, have some fun on the beach and in the sun, and so find out whether or not they wanted to marry after his divorce. Defendant warned her not to call his wife or let her know about their plans. Contrary to defendant's contention, we find nothing in such letters saying or inferring that they had been having any immoral relationship or that defendant's marital difficulties were caused by his mental condition.

Exhibit No. 70, addressed to the woman in Omaha, was actually written by defendant on April 8, 1954, the date of the alleged crime, while he was at his former employer's home. It was admittedly dated March 7, 1954, by mistake, and was never mailed but was found in defendant's pocket after the alleged shooting. Referring therein to California, he told the woman that he got away from out there and to stay where she was until he got back there in 3, 4, or 5 days, "because I got to

put a new eingine (engine) in my car but will see you soon left there last Sat. morning but have run into lots of trouble this trip."

In Garcia v. State, 159 Neb. 571, 68 N. W. 2d 151, this court said: "The rule is that one charged with a crime, who becomes a witness in his own behalf upon his trial, is subject to the same rules that govern other witnesses upon cross-examination and may, on cross-examination, be interrogated as to matters brought out on direct examination. See, Crawford v. State, supra; 3 Wharton's Criminal Evidence (11th ed.), § 1303, p. 2174; 3 Jones, Evidence (4th ed.), § 821, p. 1519.

"In this respect we have said: 'Where a defendant in a criminal case testifies in his own behalf, he is subject to the same rules of cross-examination as any other witness, and may be required to testify on his cross-examination as to any matters brought out or suggested by him. on his direct examination, and ordinarily he cannot avail himself of the objection that the evidence may incriminate him.' Poston v. State, 83 Neb. 240, 119 N. W. 520.

"And in Peterson v. State, 63 Neb. 251, 88 N. W. 549, we said: 'The scope of the cross-examination of a witness rests largely in the trial court, and its ruling will be upheld, unless an abuse of discretion is shown.' See, also, Griffith v. State, 157 Neb. 448, 59 N. W. 2d 701."

In Washington v. State, 160 Neb. 385, 70 N. W. 2d 378, this court held: "The cross-examination of a witness which relates to the issues and facts pertinent thereto may be pursued by counsel as a matter of right, but when the object of the cross-examination is to collaterally ascertain the accuracy or credibility of a witness, some latitude should be permitted. The scope of such latitude is ordinarily subject to the discretion of the trial judge and, unless abused, its exercise is not reversible error."

Such rules are applicable and controlling here. Contrary to defendant's contention, we conclude that the

trial court did not abuse its discretion and that the admission of the evidence aforesaid, under the circumstances presented in this case, was not prejudicially erroneous.

Defendant argued that instruction No. 9 given by the trial court was prejudicially erroneous. In that regard, instruction No. 4 given by the trial court among other things correctly defined the crime of manslaughter. Such crime was so redefined in instruction No. 9, after which it hypothetically required the State to prove certain specific enumerated elements by the evidence beyond a reasonable doubt before defendant could be found guilty of manslaughter. The instruction is verbose and to recite it here would serve no useful purpose. It is sufficient for us to say that the instruction was favorable to defendant. The applicable and controlling rule is that: " 'A defendant in a criminal action may not predicate error on an instruction that is more favorable to him than is required by the law applicable to the charge made.' " Luster v. State, 148 Neb. 743, 29 N. W. 2d 364. Defendant's contention should not be sustained.

Defendant argued that instruction No. 13 given by the trial court was prejudicially erroneous because it did not inform the jury that if there was a reasonable doubt as to whether or not defendant acted in self-defense, such doubt should be resolved in favor of defendant. In that regard, instructions Nos. 13 and 14, given by the trial court, both related to and submitted the matter of self-defense in sequence by the use of clear and unmistakable related language. The last paragraph of instruction No. 14 read: "Regarding the offense with which the defendant is charged, it is necessary for the State to prove beyond a reasonable doubt that the defendant, Loyd Carroll Grandsinger, was not acting in self-defense and the burden is not on the defendant to prove he was acting in self-defense, and if the evidence in this case does not establish beyond a

reasonable doubt that the defendant was not act (acting) in self-defense, then you should find the defendant not guilty."·

In Fullerton v. State, 148 Neb. 811, 29 N. W. 2d 618, we reaffirmed that: "All instructions given should be considered in determining whether a particular instruction is prejudicial." Also, in Kirkendall v. State, 152 Neb. 691, 42 N. W. 2d 374, we reaffirmed that: "Where instructions, considered as a whole, state the law fully and correctly, error will not be predicated therein merely because a separate instruction, considered by itself, might be subject to criticism.

"Where the charge to the jury, considered as a whole, correctly states the law, the verdict will not be reversed merely because a single instruction, when considered separately, is incomplete." Such rules are applicable and controlling. Defendant's contention should not be sustained.

Defendant argued that the trial court erred prejudicially in refusing to give his requested instruction No. 1 which read: "If the jury believe beyond a reasonable doubt that defendant is guilty but have a reasonable doubt as to the degree of his offense they should give him the benefit of that doubt and convict him of the lower degree." The applicable and controlling general rule is that: "It is not error to refuse instructions requested by the defendant where the court on his own motion has given the substance of such requests." Leedom v. State, 81 Neb. 585, 116 N. W. 496. The substance of defendant's request appears in instructions Nos. 3, 7, 8, and 9. As recently as Washington v. State, *supra,* this court held: "A trial court is not required to instruct in the exact language of a requested instruction. If the point is covered by an instruction couched in proper terms it meets all the requirements of the law." Defendant's contention should not be sustained.

Defendant argued that the trial court erred in refusing to give his requested instruction No. 2 which read:

"If the jury believe beyond a reasonable doubt that the defendant is guilty of first degree murder but have a reasonable doubt as to the punishment, they should give him the defendant the benefit of that doubt and fix the lessor (lesser) punishment of life imprisonment." In that connection, section 28-401, R. R. S. 1943, provides: "Whoever shall purposely and of deliberate and pre-meditated malice * * * kill another * * * every person so offending shall be guilty of murder in the first degree, and upon conviction thereof shall suffer death or shall be imprisoned in the penitentiary during life, in the discretion of the jury." Instructions Nos. 4, 6, and 7, given by the trial court, repeated that language and applied it. In Sundahl v. State, 154 Neb. 550, 48 N. W. 2d 689, we held: "Section 28-401, R. R. S. 1943, does not prescribe or authorize the court to prescribe any rule defining or circumscribing the exercise of the right to determine whether the penalty shall be death or imprisonment for life. The statute commits the whole matter to the judgment and conscience of the jury." Also, in 23 C. J. S., Criminal Law, § 1290, p. 868, it is said: "The doctrine of reasonable doubt has no application in the jury's determination as to the penalty to be imposed." See, also, 41 C. J. S., Homicide, § 399, p. 236, § 434, p. 319; People v. Krauser, 315 Ill. 485, 146 N. E. 593; Hart v. State, 220 Ind. 469, 44 N. E. 2d 346; Watts v. State, 229 Ind. 80, 95 N. E. 2d 570; State v. Tiedt, 360 Mo. 594, 229 S. W. 2d 582; People v. Martin, 12 Cal. 2d 466, 85 P. 2d 880; People v. Harris, 219 Cal. 727, 28 P. 2d 906; Hernandez v. State, 43 Ariz. 424, 32 P. 2d 18. Such authorities discuss at length the reasons for the foregoing rule. To set them forth here would serve no purpose. We conclude that defendant's contention should not be sustained.

Defendant argued that the trial court erred in refusing to give his requested instructions Nos. 3, 4, 17, and 26, all of which related to the weight to be given the testimony of certain witnesses. Instruction No. 3

told the jury in effect that greater care should be exercised in weighing the testimony of police officers, detectives, criminal investigators, and safety patrolmen than in other cases because of their natural and unavoidable tendency and bias of mind to consider everything as evidence against accused and to disregard everything which does not tend to support their preconceived opinion of the guilt of accused. Instruction No. 4 was in substance identical, but simply used the all-inclusive term "law enforcement officers." Instruction No. 17 referred to witnesses employed by the State and told the jury that greater care should be exercised in weighing their testimony than in the case of a disinterested witness. Instruction No. 26 provided in substance that in weighing the testimony of one Bud Frederickson greater care should be exercised because he was an informer or undercover man.

In Garcia v. State, *supra,* this court held: "The mere fact that a witness in a criminal prosecution is a regular public law enforcement officer does not entitle an accused to an instruction that the jury, in weighing his testimony, should exercise greater care than in weighing the testimony of other witnesses.

"Where informers, detectives, or other persons employed to hunt up testimony against the accused are called to testify against him, he is entitled to an instruction to the jury that in weighing their testimony greater care should be exercised than in the case of witnesses who are wholly disinterested."

In Fisher v. State, 154 Neb. 166, 47 N. W. 2d 349, this court held: "The rule that if a person is employed to produce evidence against the accused and he testifies against the accused, the defendant is entitled to an instruction to the jury that in weighing the testimony of the witness greater care and closer scrutiny should be exercised than in considering the testimony of witnesses who are disinterested, is generally not applicable to public officers who are witnesses."

The record discloses without dispute that all police officers, detectives, criminal investigators, and safety patrolmen who testified as witnesses for the State were regular public law enforcement officers employed by the city of Valentine, Cherry County, or the States of Nebraska and South Dakota. Contrary to defendant's contention, there is no evidence whatever that one Jack Knudtson was ever employed, rewarded, or paid by anyone as a criminal investigator or detective to produce evidence against defendant. He had once been a safety patrolman but was then a druggist, and, like many other citizens in the community, he voluntarily gave assistance after the death of patrolman Hansen. In that connection also, contrary to defendant's contention, Bud Frederickson was not an informer or undercover man employed, rewarded, or paid by anyone to produce evidence against defendant. He was simply a private citizen who in performing his civic duty voluntarily gave information and assistance to regular public law enforcement officers after defendant and Leon had informed him of their unlawful activities. We conclude that defendant's requested instructions Nos. 3, 4, 17, and 26 were not erroneously refused.

Defendant argued that the trial court erred in refusing to give his requested instruction No. 6 relating to duties of the jury in arriving at a verdict, and instruction No. 10 relating to the presumption of defendant's innocence. It is sufficient for us to say that the substance of such · requested instructions appears in other instructions given by the trial court, particularly in instructions Nos. 3, 26, and 28. Defendant's contention should not be sustained.

Defendant argued that the trial court erred in refusing to give his tendered instruction No. 16 which purported to submit the lesser charge of assault and battery. As stated in 41 C. J. S., Homicide, § 396, p. 232: "In a homicide prosecution, it is not proper to give an instruction as to assault in any of its grades

unless such instruction is applicable and authorized by the evidence." In Clarence v. State, 89 Neb. 762, 132 N. W. 395, it is said: "The eighth instruction asked and refused was to the effect that the jury might find defendant guilty of assault and battery, if they believed the evidence so warranted. This was properly refused, as there was no evidence which could require the instruction to be given." See, also, Mantell v. State, 141 Neb. 15, 2 N. W. 2d 586; State v. Johnston, 221 Iowa 933, 267 N. W. 698. Such authorities are applicable and controlling in the case at bar. Defendant's contention should not be sustained.

Defendant argued that the prosecutor was guilty of misconduct in final argument by appealing to the passion and prejudice of the jury which deprived defendant of a fair trial and required reversal. In that connection, instruction No. 1 told the jury: "In determining any of the questions of fact presented in this case you must be guided solely by the evidence introduced at the trial. The jury has no right to indulge in speculations, conjectures or inferences not supported by the evidence or consider any evidence that has been offered and excluded or ordered stricken or deleted during the progress of the trial. Neither are the opening statements, remarks or arguments of counsel or the rulings and remarks of the Court evidence."

It is elementary that: "* * * the prosecutor may state conclusions which are predicated upon the evidence" and unless an error in argument complained of was prejudicial to the rights of a defendant, the cause should not be reversed. Dobry v. State, 130 Neb. 51, 263 N. W. 681.

In Lee v. State, 124 Neb. 165, 245 N. W. 445, this court held: " 'An appeal for conviction based altogether upon the evidence, however fervent it may be, is not an abuse of the privilege of advocacy.' Parker v. State, 67 Neb. 555.

"It is not misconduct on part of the prosecuting at-

torney, but is indeed his duty, to comment on the conduct and credibility of defendant's witnesses, based on evidence and facts properly before the court.

"Remarks in his argument by the county attorney brought about and made in answer to the arguments of prisoner's counsel, unless necessarily prejudicial to the accused, do not necessitate the reversal of a conviction."

In that regard, section 29-2308, R. R. S. 1943, specifically provides in part: "No judgment shall be set aside, or new trial granted, or judgment rendered in any criminal case, on the grounds of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, if the Supreme Court, after an examination of the entire cause, shall consider that no substantial miscarriage of justice has actually occurred."

In the light of such rules and others hereinafter discussed, we deem worthy of discussion only that part of the closing arguments of the special prosecutor hereinafter set forth to which defendant made objections and moved for mistrial, which were overruled by the trial court. In that respect also, no request ever was made by defendant's counsel for an instruction telling the jury to disregard any part of the closing argument. In the case at bar, it was the duty of the jury, if defendant was found guilty of first degree murder to also fix the penalty, at either death or imprisonment in the penitentiary during life "in the discretion of the jury" which whole matter was committed by statute to the judgment and conscience of the jury. Sundahl v. State, *supra*. Thus, we call attention to the fact that the closing argument of the special prosecutor discussed herein related solely to the penalty to be imposed if the jury found defendant guilty of first degree murder. With relation thereto, the special prosecutor said: "Do you think it is possible and right that this man should have gone down there to the penitentiary of Nebraska where the meals will perhaps be better than he had in

the jail, and the beds will perhaps be better, where under our Constitution and our laws he has the legal right to attempt to get before the Board of Pardons and Parole * * * and present to them a plea for clemency, and at which you or I or the people that really know about this thing would probably not be present, because you do have the right to know that the Constitution and laws of this State create a Borad (Board) of Pardons and Parole to pass upon those cases and determine whether or not prisoners * * * this prisoner's sentence should be commutted (commuted) or whether there should be a parole, and now those are things, among others, which you have a right to know in determining what ought to be done in this case."

That part of the statement with regard to meals and beds in the jail was predicated upon defendant's complaints with regard thereto appearing in his own evidence. Such remarks could not be prejudicial. We are primarily concerned with the special prosecutor's remarks about pardon or parole.

In Sundahl v. State, *supra*, we said: "Pardon or parole relates to something that may happen after conviction and to action by the executive department. The jury had nothing to do with relation to the punishment except to determine whether it should be death or imprisonment for life. In the event the decision was for life imprisonment, whether or not he should be later paroled or pardoned was not a matter for it to decide. The jury's task at that point was to choose between one or the other of the penalties. That decision should not rest upon whether parole was easy or difficult to secure." By analogy, it was improper for the prosecutor to make the statement heretofore set forth with regard to pardon or parole, and it was error to do so. The question here is whether or not it was prejudicial error. We conclude that it was not prejudicial error in a case such as that at bar where the jury is required to fix the penalty if it found defendant guilty of murder in the first degree,

because the argument of the prosecutor was simply a statement of existing constitutional and statutory law which all men, including the jurors, were presumed to know and doubtless did already know about before the statement was made. It will be noted that no statement was made by the prosecutor that pardon or parole was easy or difficult to secure or that actually or by statistical comparison with other cases defendant would be able to present a plea to the board and obtain a hearing or obtain a pardon or parole. He simply said that defendant had a legal right to attempt to present a plea therefor to a lawfully created Board of Pardons. Such statement was unaccompanied by any other objectionable or prejudicial remarks. Under the circumstances in this case, the statement as made should not require reversal. It would be a perversion of truth and justice to hold otherwise. Those conclusions are supported by Frady v. People, 96 Colo. 43, 40 P. 2d 606, 96 A. L. R. 1052; Sullivan v. State, 47 Ariz. 224, 55 P. 2d 312; State v. Buttry, 199 Wash. 228, 90 P. 2d 1026; Powell v. Commonwealth, 276 Ky. 234, 123 S. W. 2d 279; 23 C. J. S., Criminal Law, § 1107, p. 586; 24 C. J. S., Criminal Law, § 1902, p. 896.

Defendant also complained about other statements which were either conclusions of the prosecutor predicated upon the evidence or reasonable inferences therefrom, or were remarks not necessarily prejudicial, made in answer to arguments of defendant's counsel, or were statements which could not upon any theory have been prejudical or to which no proper objections were made. They require no further discussion except to point out that in a homicide case the prosecutor has a right to urge the jury to fix the penalty at death if the accused is found guilty of murder in the first degree and the scope of his argument in that regard should be given a broad latitude, provided it is predicated upon the evidence or reasonable inferences therefrom.

Finally, defendant argued that unless the verdict and

judgment herein were reversed, this court should reduce the sentence under the provisions of section 29-2308, R. R. S. 1943, upon the ground that there was a great deal of sentiment and prejudice worked up against defendant in Valentine and the immediate vicinity and that the alleged crime happened rapidly without premeditation or plan to kill the patrolman. In that regard, insofar as this record discloses, no request was ever made by defendant for a change of venue. Further, the record contains ample competent evidence of premeditation. There is competent evidence that defendant had armed himself for the express purpose of resisting arrest or apprehension, and when the patrolman attempted to arrest him he carried out his premeditated plan and killed the patrolman, knowing him to be an officer, in an attempt to escape and avoid prosecution for state and federal offenses admittedly theretofore committed by him. The record discloses that defendant had a fair trial and it abounds with competent evidence, not the least of which are defendant's own confessions, statements, and evidence, all of which amply support the jury's conclusion that defendant was guilty of first degree murder and that the penalty should be death as provided by law.

This court discussed at length section 29-2308, R. R. S. 1943, and its application in Sundahl v. State, *supra,* and MacAvoy v. State, 144 Neb. 827, 15 N. W. 2d 45, certiorari denied 323 U. S. 804, 65 S. Ct. 559, 89 L. Ed. 642. Applicable conclusions reached therein need no repetition here. It is sufficient for us to say that because they were warranted by the evidence, we find no justifiable reason for substituting our judgment for that of the jury and the trial court by changing the verdict of the jury fixing the penalty at death, or the judgment and sentence of the trial court rendered in conformity therewith. Finding no prejudicial error in the record, we conclude that the judgment of the district court should be and hereby is in all respects affirmed.

Friday, March 30, 1956, between the hours of 6 a. m. and 6 p. m. of said day is fixed as the date for carrying into effect the sentence of the district court.

AFFIRMED.